Eunice **FLANAGAN**, Individually, and Eunice Flanagan, Administratrix of Joseph Francis Moore, Deceased, Respondents,

v.

**G. L. DeLAPP, Jr., et al., Appellants.**

**No. 59053.**

Supreme Court of Missouri,
En Banc.

March 8, 1976.

William E. Shull, Duncan & Russell, Kansas City, for appellants.

Arthur Kincaid, Hale, Kincaid, Waters & Allen, Liberty, for respondents.

FINCH, Judge.

On March 31, 1971, seven days before his death, Joseph Francis Moore (decedent) ex-

ecuted a warranty deed conveying 275 acres of farmland (2 tracts), plus a 7/12ths interest in a 11.52 acre tract, to G. L. DeLapp, Jr., an attorney, and his wife, Elizabeth J. De-Lapp, a niece of decedent. This suit was brought to set aside that deed on the basis of alleged undue influence by G. L. DeLapp, Jr. (hereinafter DeLapp). The trial court found that execution of the deed was the result of undue influence by DeLapp and ordered the conveyance set aside and the deed cancelled. Only DeLapp appealed from that judgment, the appeal being to the Missouri Court of Appeals, Kansas City District, which affirmed. Thereafter, on application of DeLapp, we ordered the case transferred pursuant to Art. V, § 10, Mo. Const. We now review the case as though here on direct appeal. We affirm.

Decedent (age 74) died intestate on April 7, 1971, leaving as his surviving heirs at law, a sister, Eunice Flanagan (age 71), and a brother, Thomas Corydon Moore (age 75),[1] who had been declared incompetent in 1969. Mrs. Flanagan was appointed administratrix of decedent's estate. She then brought this suit individually and as administratrix (pursuant to probate court authorization), naming as defendants DeLapp and his wife, Elizabeth, grantees in the deed, the surviving incompetent heir at law, Thomas Corydon Moore, and the surviving guardian of his estate, Elizabeth J. DeLapp.[2]

The issues presented on this appeal concern (1) the sufficiency of the evidence to show undue influence by DeLapp in the execution of the deed by Joseph, and (2) whether the court erroneously excluded proffered testimony of DeLapp on the basis of § 491.010,[3] the dead man's statute.

The evidence discloses that on March 31, 1971, Joseph became ill. When he finished his breakfast that morning, he could not get up from the table. Mrs. Flanagan, who had been living with Joseph since 1969, had to help him back to bed. The same thing happened at lunch. Later that afternoon when she tried to get him off the bed, his head fell back and he could not get up. Mrs. Flanagan then called the doctor and at his direction called an ambulance and had Joseph taken to the Cameron Community Hospital. Records with reference to his admission to the hospital show that his condition was diagnosed as a stroke syndrome[4] and that his entire left side, including his hand and arm, were weak and had no motor voluntary movement. He could not move his left arm or leg, could not get out of a chair, and could not walk. The impression as recorded at that time in the hospital records was that the patient had suffered cerebral thrombosis with left hemiparesis.

In addition to calling the doctor, Mrs. Flanagan called DeLapp and told him what she was doing. Later that same day, he came by and picked up Mrs. Flanagan and the two of them went to the hospital. En route, according to the testimony of Mrs. Flanagan, DeLapp told her that he was going to get Joseph to sign a deed conveying his farms to DeLapp and his wife, Betty. Mrs. Flanagan testified thus with reference to that conversation:

"I said first he couldn't do it, and he said he had to because of the taxes; that the estate taxes would be so big that he had to have this so that we wouldn't have to pay those taxes, and he said if Joe—if half of Joe's estate went into Tom's estate, then the taxes on Tom's estate, when he died, would be especially high, and that he has to do it because of the taxes and that was the reason he was going to do it."

1. Mrs. Flanagan had one daughter, Elizabeth J. DeLapp. Thomas Moore had no children.

2. Decedent and Elizabeth J. DeLapp had been appointed as co-guardians of the estate of Thomas Corydon Moore and they served jointly until decedent's death. During all of that time, G. L. DeLapp, Jr. served as attorney for the co-guardians.

3. All statutory references are to RSMo 1969 unless indicated otherwise.

4. He had had several light strokes previously and had been admitted to the hospital therefor on several occasions.

Mrs. Flanagan further testified that so far as she knew, there had been no prior conversations with Joseph with reference to conveyance of his farms.

On arriving at the hospital, DeLapp asked Mrs. Hines, a receptionist at the hospital who was a notary public, to accompany them to Joseph's room. As they passed a small chapel, DeLapp told Mrs. Flanagan to wait in there and he would take care of the matter. She went into the prayer room and in 5 or 10 minutes DeLapp came back and displayed a deed signed by Joseph conveying the property in question to G. L. DeLapp, Jr. and Elizabeth J. DeLapp, husband and wife, subject to a life estate in the grantor.

Mrs. Hines, who acknowledged the deed in question, testified as follows with reference to the signing of the deed:

> "Mr. DeLapp came up and told me Mr. Moore was ready to sign the papers and I walked down the hall with Mr. DeLapp and we didn't have any room. We had to put him in the hall that night—I called it the alcove—and when we got in the room, Mr. DeLapp said to Mr. Moore, 'Joe, we are down here to have you sign the paper and this is Helen Hines and she is a notary.' And he lifted Joe up and he signed the papers. Seemed like he signed two."

Mrs. Hines testified that she then went back to her desk and completed the acknowledgment of the deed.

DeLapp was not permitted to testify as to what occurred when the deed was signed or with reference to his conversations with Mrs. Flanagan.

In ruling that the deed should be set aside on account of undue influence, the trial court determined (1) that as a result of an attorney-client relationship found to exist between Joseph and DeLapp there was a presumption of undue influence by DeLapp which was not overcome by evidence, and (2) that the evidence affirmatively demonstrated that undue influence by DeLapp existed in fact.

We consider first the issue of whether a presumption of undue influence exists in this case as a result of an attorney-client relationship.

■ It is an almost universal rule that any client's transfer of his property to his attorney is subject to being set aside as resulting from undue influence unless the attorney is able to meet the burden of proving that the transaction was fair and equitable. In 7 Am.Jur.2d, Attorneys at Law, § 95 (1963), it is stated that "(I)t is presumed that undue influence of fraud attaches to any assignment or conveyance that an attorney takes from his client while the relation of attorney and client exists." Similarly, 7 C.J.S. Attorney and Client § 128 (1937) states:

> " * * * The general rule that all transactions and dealings between attorney and client are subject to close scrutiny and presumptively fraudulent or the result of undue influence applies with full force, however, to any purchase or acquisition by an attorney of his client's property. Hence, a transfer, conveyance, or assignment of property by a client to an attorney is subject to avoidance and being set aside as constructively fraudulent or the result of undue influence, except to the extent that it operates as a payment of reasonable and proper fees, if the attorney fails to discharge his burden by showing that the transaction was fair, equitable, and honest, for an adequate consideration, and that the client had the benefit of impartial advice or was fully informed of the nature and effect of his act so that he was in the same position as if he had dealt with a stranger. * * *"

See also 7 C.J.S. Attorney and Client § 129 (1937); 7 Am.Jur.2d, Attorneys at Law, § 96 (1963).

■ In Missouri the rule is in accord. It is stated in *Laspy v. Anderson,* 361 S.W.2d 680, 682 (Mo.1962), as follows:

"The law is well established in this state and elsewhere that public policy dictates the necessity to protect the confidential and fiduciary attorney-client relationship. Consequently, when a conveyance from a client to an attorney is attacked it is considered presumptively fraudulent and the burden is on the attorney to prove by convincing evidence that the transaction evidenced by the conveyance, as well as the conveyance itself, was fair and equitable in every respect. (Citing cases)."

Another Missouri case announcing such a rule is *Bybee v. S'Renco,* 316 Mo. 517, 291 S.W. 459 (1926). See also *Cuthbert v. Heidsieck,* 364 S.W.2d 583 (Mo.1963).

Appellant DeLapp does not really question the foregoing rule. Rather, he contends that it is inapplicable in this case on the theory that although it was stipulated that DeLapp had served continuously as attorney for Joseph and Elizabeth as co-guardians of the estate of Thomas C. Moore from the time the guardianship was created until the date of Joseph's death, it was not shown that he had acted as attorney for Joseph individually in any instance. The issue squarely presented is whether the attorney-client relationship which existed with reference to the guardianship estate also resulted in such a relationship applicable to transactions involving DeLapp and Joseph individually.

■ While it is true that the evidence did not disclose that DeLapp had served as attorney for Joseph in any individual matters, it also was true that the evidence disclosed that Joseph had no other attorney handling such matters. Thus, the only attorney-client relationship which Joseph had with any lawyer, so far as the evidence discloses, was the one with DeLapp in connection with the guardianship of the estate of Joseph's brother. That relationship had continued over a period of time and was one in which Joseph would look to and rely upon DeLapp for professional and confidential advice and information. It is unrealis-

tic to conclude that said relationship and confidence existed only so long as DeLapp dealt with matters in the brother's estate but disappeared completely when he dealt with Joseph about a conveyance of his own property. This is particularly true in this case since, according to DeLapp's explanation to Mrs. Flanagan, the objective of the conveyance was to avoid having part of the property pass to the guardianship estate. The transaction in question affected both Joseph individually and the guardianship estate for which DeLapp was the attorney. Accordingly, we hold that a confidential attorney-client relationship existed which was applicable to the transaction in question.

The conclusion we reach is in accord with the rule stated in 7 C.J.S. Attorney and Client § 127b(3) (1937):

"The rule that dealings between attorney and client are presumptively fraudulent is not restricted to contracts or dealings with respect to the rights or property involved in the particular transaction or proceeding in which the attorney is acting for the client, but it may extend to other transactions and contracts, where the relationship may be presumed to give the attorney some advantage over the client."

Similarly, in the case of *Swaim v. Martin,* 158 Ark. 469, 251 S.W. 26, 27 (1923), the court stated:

"The rule that an attorney who contracts with his client has the burden of proving that no advantage has been taken of the situation of the latter is not restricted to contracts or dealings with respect to the rights or property in controversy in the particular proceeding in which the attorney is acting for the client, but it may extend to other transactions and contracts, where the relationship may be presumed to give the attorney some advantage over the client.  *  *  *  *"

■ There was no evidence presented by DeLapp to explain or justify the convey-

ance to him and his wife or to show that the deed was not the result of undue influence resulting from his attorney-client relationship with Joseph. Nor was DeLapp aided by the testimony regarding the conveyance given by Mrs. Hines or Mrs. Flanagan. According to the account by Mrs. Hines, Joseph was told only that they were there to have him sign a paper and that Mrs. Hines was a notary. He was then lifted up by DeLapp to sign the deed. Nothing was said as to the contents of the paper or even that it was a deed or that it conveyed all his land to DeLapp and his wife. According to Mrs. Flanagan, the whole occurrence took only a short time, as DeLapp returned in 5 or 10 minutes with the deed. Joseph could not have read the deed because, according to Mrs. Flanagan's testimony, he could not read without his glasses and they were at his home, not at the hospital. This evidence all is supportive of the idea that Joseph relied on DeLapp and signed because DeLapp asked him to sign. Accordingly, the trial court was justified in concluding that the deed was induced by undue influence arising from the attorney-client relationship between DeLapp and Joseph and that the deed should be set aside for that reason.

In view of this conclusion we need not reach or decide the question of whether the evidence was also sufficient to justify the finding of the trial court that the evidence disclosed that in fact the deed was induced by undue influence.

■ The second question presented by DeLapp concerns the propriety of the court's action in excluding testimony by him on the basis of the provisions of § 491.010. As pointed out in Comment, Waiver of the Dead Man's Statute, 39 Mo.L.Rev. 218 (1974), that statute has three functional parts. First, it qualifies as witnesses those individuals disqualified at common law because of their interest in the outcome of the case. Next, in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, the so-called transactions proviso of the statute makes a surviving party incompetent as a witness in his own favor or in favor of one claiming under him. Under this proviso the witness is incompetent only as to those matters about which decedent could have testified if he had lived. Finally, where one of the parties to a contract is deceased, and an executor or administrator is a party to a suit involving such contract, the portion of the statute referred to as the administration proviso makes the surviving party to the contract totally incompetent as a witness except as to matters occurring after probate of the will or appointment of an administrator.[5]

■ Respondent objected to testimony by DeLapp on the basis of both the transactions proviso and the administration proviso. The objection was sustained on both grounds. DeLapp then made an offer of

5. The full text of § 491.010 is as follows: "No person shall be disqualified as a witness in any civil suit or proceeding at law or in equity, by reason of his interest in the event of the same as a party or otherwise, but such interest may be shown for the purpose of affecting his credibility; provided, that in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him, and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing disqualification, shall be admitted to testify in his own favor, except as in this section is provided, and where an executor or administrator is a party, the other party shall not be admitted to testify in his own favor, unless the contract in issue was originally made with a person who is living and competent to testify, except as to such acts and contracts as have been done or made since the probate of the will or the appointment of the administrator; provided further, that in actions for the recovery of any sum or balance due on account, and when the matter at issue and on trial is proper matter of book account, the party living may be a witness in his own favor so far as to prove in whose handwriting his charges are, and when made, and no farther."

proof wherein he stated that he would testify that he never acted as attorney for Joseph, that when the deed was executed, he had no reason to believe Joseph would not live as he had been hospitalized previously for the same condition, that he neither used nor attempted to use undue influence to secure the deed, that the subject of the disposition of Joseph's farms had been discussed on previous occasions, of which Mrs. Flanagan and Betty DeLapp were aware, and that, based on his observations of and conversations with Joseph on the day the deed was executed, Joseph did understand at that time the nature of his property and the natural objects of his bounty. An objection to the offer of proof was sustained.

It is DeLapp's position that the foregoing tendered testimony was not prohibited by § 491.010, and that, even if it was, Mrs. Flanagan waived her right to invoke the statute by personally taking the stand and testifying as to the things which occurred.

DeLapp's brief states that § 491.010 is inapplicable to the testimony he proposed to give and that the trial court erred in excluding it. His position is somewhat confusing because his brief also states that "[T]he appellant would acknowledge that for most purposes, his testimony would have been incompetent under a strict interpretation of RSMo § 491.010, as to those matters which could be or might be refuted by the decedent if he were still alive." The brief further states: "The rule would apparently be more strictly enforced where an administrator is a party to the cause of action, but still apparently would not apply where the testimony to be introduced does not involve the decedent and was not in his presence, or concerns statements not made by him."

Cases construing § 491.010 clearly establish that a surviving party is incompetent to testify as to matters relative to the contract or cause of action in issue as to which decedent could have testified if he had lived and that where an executor or administrator is a party to the suit, the surviving party to a contract is totally incompetent except as to matters occurring after probate of the will or appointment of an administrator. The cases do not support appellant's position that the proviso as to an administrator or executor as a party does not apply in such a way as to make competent the testimony which DeLapp proposed to give. One of the clearest statements of the meaning and effect of the statute is contained in *Davis v. Robb*, 10 S.W.2d 680, 681 (Mo.App.1928):

> "The purpose of the statute in general is held to be to put all interested parties on an equality, and, if all are living, all can testify; but when an adverse party is dead, so that he could not contradict or explain the evidence of the living party, then the living party cannot testify. In a general way the statute has been held to mean that the living party is not rendered incompetent in all respects by the death of the other party, but his incompetency is limited to those things about which the other party, if living, could testify. *Elsea v. Smith*, 273 Mo. 396, 407, 202 S.W. 1071.

> "The latter part of the section, however, which provides that, 'where an executor or administrator is a party' to the suit, 'the other party shall not be admitted to testify in his own favor, unless the contract in issue was originally made with a person who is living and competent to testify, except as to such acts and contracts as have been done or made since the probate of the will or the appointment of the administrator,' is an arbitrary provision of the statute, is not open to construction, and the construction given the other parts of the statute does not apply to that provision.

> "When an administrator is a party, the mouth of the adverse living party to the contract or cause of action on trial is closed as to all matters that occurred prior to the probate of the will or the appointment of the administrator, regardless of whether or not the other party, if living, could testify relative to the

same matter. *Kersey v. O'Day*, 173 Mo. 560, 569, 571, 73 S.W. 481; *Weiermueller v. Scullin*, 203 Mo. 466, 474, 101 S.W. 1088; *Cook v. Higgins*, 290 Mo. 402, 431, 235 S.W. 807."

A later statement of the effect of the transactions and administration provisos is set out in *Birdsong v. Estate of Ladwig*, 314 S.W.2d 471, 475 (Mo.App.1958):

"The dead man's statute (now sec. 491.-010) has been the source of considerable confusion, but it is now well settled that in respect to the first portion, where one of the original parties to the contract or cause of action is dead the other party shall not be admitted to testify in his own favor, the disability imposed is not absolute but applies to only such acts and transactions concerning which the deceased could, if living, have denied (for convenience we will refer to this portion of the statute as the 'transactions' disqualification); whereas the latter portion of the statute, which provides that where the executor or administrator is a party the opposite party shall not be admitted to testify in his own favor except as to acts and contracts made since the probate of the will or appointment of administrator, imposes an absolute disability to testify in a contract action concerning *anything* which occurred before commencement of probate (for convenience we will refer to this as the 'administration' disqualification)."

See also cases cited in Witnesses, Key Numbers 139(1), 144(4), 149(2), 168; also Comment, Waiver of Dead Man's Statute, 39 Mo.L.Rev. 218 (1974).

█ It is clear that under the terms of § 491.010, as repeatedly construed and applied by the courts of this state, the evidence detailed in the offer of proof was inadmissible. It is true that in this case, as in *Birdsong v. Estate of Ladwig, supra*, the objection by respondent which came immediately after DeLapp gave his name was premature. Some testimony conceivably could have related to matters subsequent to appointment of the administrator and, hence, could have been admissible. However, the offer of proof disclosed that all of the proposed testimony was inadmissible. Hence, we find no error in the action of the court.

Appellant's real complaint is that it is grossly unfair and not necessary to the purpose of the statute to allow the administratrix to testify to various matters concerning the controversy and at the same time prohibit the surviving party to the contract from testifying with reference to those same matters. Similar sentiments have been expressed on at least two occasions in cases construing this statute. In *Kersey v. O'Day*, 173 Mo. 560, 73 S.W. 481, 484 (1903), Judge Fox, in writing the court's opinion, stated:

" * * * Speaking for myself, it is difficult to see the reason of this strict rule. What difference does it make whether the conversation was before or after the grant of letters of administration? The dead man is no party to the conversations. All the persons engaged in the conversations are living. Some of them are permitted to testify to the conversations, but the living party to the suit is excluded because the opposing party to the suit is dead. If he had been living, and was not present at the conversation, he would not be able to say anything about it. It strikes me, as to these conversations, separate and independent from any transaction with the deceased, to permit the living witnesses to give their version of the conversation, and then exclude the living party from giving his, is directly in conflict with the spirit of the statute, of placing all parties on an equal footing. The party to the suit must remain silent, and living witnesses can testify that he made certain statements, and he is not permitted even to deny their statements. If the deceased was present at the time of these conversations, I could see the reason of the rule."

Nevertheless, the court went on to affirm the action of the trial court in enforcing the

administration proviso of the act, because that was what the statutory provisions called for.

Likewise, in *Schwalbert v. Konert*, 230 Mo.App. 811, 76 S.W.2d 445, 453 (1934), the court criticized the required inflexibility of the act, saying:

"Here we have witnesses for plaintiff who have been permitted to testify to conversations showing admissions made by defendants to the effect that they had borrowed the money in question from the deceased. It was not claimed by any one that the deceased took part in such conversations. All the persons who took part therein were living at the time of the trial. Common fairness would, therefore, seem to require, as the trial court ruled, that defendants should be permitted to give their version thereof. Nevertheless, because of the arbitrary language of the statute, we must hold that the court erred in refusing to exclude defendants as witnesses merely because the conversations occurred before instead of after the appointment of the administrator. We are thus compelled by a statute which we are not at liberty to disregard, and which is open to but one construction, to render a decision which appears to be unreasonable and unjust.

"The Legislature most certainly would not have enacted such a provision could it have foreseen the possibility of creating this unjust inequality in the positions of parties before a trial court and a jury. Such inequality has been made clear in the opinions of our Supreme Court and of our Courts of Appeals and will without doubt be remedied when brought to the attention of the Legislature. In the meantime, we can only say that our Supreme Court having declared itself to be bound to follow the rule laid down in the statute, it is our plain duty under the Constitution to follow that court's decision. We, therefore, hold that the trial court committed reversible error in refusing to exclude defendants as witnesses."

Again, the court felt that the statute went too far, and expressed a hope for legislative relief, but nevertheless applied the express provisions of the statute.

■ We, too, recognize, as have these earlier decisions, that the dead man's statute is inflexible and unnecessarily harsh. However, any change therein can come only by legislative action. It is our obligation to apply the clear language of the statute. Many cases have so recognized.

■ The remaining question for decision is whether, as DeLapp contended, Mrs. Flanagan waived the incompetency of DeLapp by taking the witness stand and testifying. We hold that she did not. Sec. 491.010 makes surviving parties to the contract such as DeLapp incompetent but says nothing whatsoever, either expressly or by implication, to make the administrator of the deceased party also incompetent. Obviously, the general assembly did not so intend. It is possible to waive the incompetency of a surviving party. This can be done in various ways, as noted in Comment, Waiver of Dead Man's Statute, 39 Mo.L. Rev. 218, 225 (1974). However, the act of Mrs. Flanagan in testifying is not comparable to any of the acts or events mentioned in said comment as being sufficient to result in a waiver of the statutory disqualification.

Judgment affirmed.

SEILER, C. J., and MORGAN, HOLMAN, HENLEY and DONNELLY, JJ., concur.

BARDGETT, J., concurs in separate concurring opinion filed.

BARDGETT, Judge (concurring).

I concur in the principal opinion but do so for the reason that defendants' offer of proof does not specifically deny statements attributed to him (DeLapp) by Mrs. Flanagan in her testimony concerning the conversation en route to the hospital.