**Eugene V. MILLER and Frances Miller, Appellants, Cross-Appellees,**

**v.**

**Dallas E. SEARS and Sara P. Sears, Personally, and Norlite, Inc., Appellees, Cross-Appellants.**

**Nos. 4762, 4763.**

Supreme Court of Alaska.

Dec. 4, 1981.

Charles D. Silvey, Merdes, Schaible, Staley & DeLisio, Inc., Fairbanks, for appellants/cross-appellees.

Joseph W. Sheehan, Fairbanks, for appellees/cross-appellants.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and COATS, Judge, Court of Appeals.*

* Coats, Judge, Court of Appeals, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. Eugene Miller was named as a shareholder, director, and officer of Norlite, Inc. when it was incorporated. His holdings were only nominal. For convenience references to the Sears include Norlite, Inc. unless stated otherwise.

MATTHEWS, Justice.

In this case a judgment mandating rescission of a sale of real estate and ordering restitution was entered. Many claims of error are presented. We affirm that portion of the judgment requiring rescission, vacate the award of restitution, and costs, and remand for further proceedings.

## FACTUAL AND PROCEDURAL SETTING

During February 1976, Eugene and Frances Miller decided to move from Alaska. Their house, where Mr. Miller also practiced law, was put up for sale. Soon thereafter, the Millers began negotiating with Dallas and Sara Sears for the sale of the house.

For at least four years prior to the sale negotiations, Eugene Miller had represented Dallas and Sara Sears as their attorney. Concurrently with the negotiations, Eugene Miller drafted the incorporation papers for Norlite, Inc., which owned the Sears' business holdings and ultimately became the purchaser of the Millers' home.[1]

The documents consummating the sale were prepared by an employee of Eugene Miller. As they were originally prepared, the documents would have conveyed the property to the Sears personally, and the Sears would have been personally liable on the note for the balance of the purchase price. At the time scheduled for closing the sale, the Sears advised Eugene Miller that they wanted these documents changed to designate Norlite, Inc. rather than themselves as purchaser and obligor. The change was made and on June 29, 1976, closing took place. The sale price was $500,000.00. A down payment of $30,000.00 was paid and the balance, $470,000.00, was to be paid under the terms of a promissory note from Norlite, Inc.[2] The note was se-

2. The note required the following payments: $20,000.00 on or before September 1, 1976; $50,000.00 on January 1, 1977; approximately $130,000.00 payable to the Small Business Administration in monthly installments of $701.00 including interest at three percent, the first

cured by a Deed of Trust under which Norlite, Inc. was trustor. The Sears also signed a document which was appended to the deed of trust entitled "Indemnity Agreement." This agreement provided that the Sears would personally guarantee the performance of Norlite's obligations under the deed of trust. One of Norlite's obligations under the deed of trust was to pay the promissory note. The Sears were to be given possession no later than January 1, 1977.

The parties differ considerably as to what transpired during the negotiations. The Sears claim that Eugene Miller misrepresented the income-producing capabilities of the property, that Eugene Miller stated that his law associate would continue as a lessee in the building, and that they were never advised to seek independent counsel. They also contend that they did not realize that they would be personally liable as guarantors of the note. Eugene Miller denied making representations concerning the rental value of the property or his associate's intentions. He testified that he had advised the Sears to seek independent counsel and believed that they had done so before the documents were signed. He also

payment to be due January 8, 1977; the remaining sum due, approximately $270,000.00, was to be paid to the Millers in monthly installments of $2,500.00 including interest at nine percent, interest commencing as of January 1, 1977, the first payment to be due on July 1, 1977.

3. Most notably, the $50,000.00 payment originally due January 1, 1977, was made payable on July 1, 1977. The monthly payments of $2,500.00 were to begin January 1, 1977, and the SBA payments were to begin November 1, 1976.

4. The January 12, letter states:
Dear Gene and Francis,
The other night we had a meeting with a corporate attorney, just to ask a few questions about the business. He looked over the papers we had signed with you, for the Barnette property, and he said that it really had some problems in it for us. We had no idea that we had tied up everything that we owned plus everything we may own, in that one contract. We were under the impression that it was a contract on that building alone. We were also told that Norlite should not have purchased the building and that we had

testified that he had made it clear to the Sears that they would be personally liable on the note.

Following the sale, the Millers purchased a farm in Missouri and took up residence there. The Sears requested and received several modifications of the sale payment terms.[3] They paid $30,000.00 on August 23, 1976. They took possession a few days before November 1, 1976, and immediately began remodeling the residential portion of the property with a view to converting it to commercial uses.

On January 12, 1977, the Sears, after consulting with another attorney, wrote the Millers, requesting to "just void the contract...."[4] This was rejected by the Millers. On March 12, 1977, the Sears sent the Millers a formal notice purporting to cancel the sale.

When settlement discussions failed, the Millers sued the Sears and Norlite, Inc. for recovery of the amount owing on the promissory note. The Sears answered stating breach of fiduciary duty as an affirmative defense, and counterclaimed on the same theory, requesting rescission of the sale and monetary damages.

been ill advised. He also said that in no way should our personal liability have been included with that of Norlite or vice-versa. In other words, "we've been had."
As you know, we had thought that the offices were going to be rented out to Brett Wood, that too has presented a hardship.
All I can say is that we took you at your word and that we should have had a more "up town" approach.
Due to the financial bind we are now in, because Brett backed out of his agreement, and because the contract seems to have been something more than misleading to us; let's just void the contract, return our money and try to resell the property. I don't think that you should have any problems, in fact Ed Niewohner has shown a great deal of interest.
We both feel badly that all of this has transpired but we do feel that you have taken advantage of the situation. I guess I am apologizing for my own stupidity and gullibility.
Sincerely,
/s/ Sara P. Sears

At trial, the jury found for the Sears in a special verdict accompanied by interrogatories. The court granted judgment for rescission of the contract and awarded attorney's fees and costs to the Sears. Subsequently, a hearing on restitution was held and the court awarded the Millers restitutionary damages in the amount of $1,857.00, plus interest. All parties have appealed.

## BREACH OF ATTORNEY'S FIDUCIARY OBLIGATIONS

The central challenge the Millers raise against the judgment of rescission is that too high a legal standard was imposed upon Eugene Miller in his dealings with the Sears. At trial, the following interrogatories were submitted to the jury in a special verdict:

INTERROGATORY NO. 1: Have the Sears proved, by a preponderance of the evidence that there was an attorney-client relationship existing between Mr. Miller and the Sears and Norlite, Inc. at the time of this transaction?

If your answer to the above interrogatory is "No," then you should sign Verdict Form No. I. If you answer interrogatory no. 1 "Yes," then answer each of the following questions.

INTERROGATORY NO. 2: Was the transaction fair to the Sears and Norlite, Inc.?

INTERROGATORY NO. 3: Were all the facts which were known or should have been known to Mr. Miller disclosed to the Sears prior to the sale?

INTERROGATORY NO. 4: Did Mr. Miller either fully explain to the Sears the significance and legal effect of each term or advise the Sears to obtain independent legal counsel to explain the transaction in question?

If you have answered each of interrogatories numbered 2, 3, and 4 "Yes," you should sign Verdict Form No. I. If you have answered "No" to any of numbers 2, 3 or 4, then you should sign Verdict Form No. II.

The jury answered the first three interrogatories in the affirmative and the fourth in the negative.

The Millers claim that interrogatory number 4 is superfluous. They argue that the court should have entered judgment rejecting the remedy of rescission based upon the jury's findings in interrogatories numbers 2 and 3 that the transaction was fair to the Sears and that Eugene Miller had disclosed to the Sears all the facts which he either knew or should have known.

Interpreting interrogatories number 3 and 4 together, it is plain that the word "facts" used in interrogatory number 3 does not include the "significance and legal effect" of the contract terms referred to in interrogatory number 4. There would have been no reason to treat legal effects separate from facts, as they were in interrogatory number 4, if the latter were meant to include the former.

 Sales transactions between lawyers and their clients are subject to rescission where the client expects the lawyer to act as such for the client and the lawyer does not fully discharge his fiduciary obligations to the client.[5] Courts will scrutinize such transactions for fairness and the lawyer's obligation is to explain all relevant facts and the legal significance of the documents.[6] Thus, even though the transaction may be fair, and the lawyer may have disclosed all matters of fact relevant to the transaction, the transaction is voidable if the legal consequences flowing from it are not explained.[7] Therefore interrogatory

---

5. See e.g., McFail v. Braden, 19 Ill.2d 108, 166 N.E.2d 46 (1960); Flanagan v. DeLapp, 533 S.W.2d 592, 595 (Mo.1976); Van Orman v. Nelson, 78 N.M. 11, 427 P.2d 896 (1967); Howard v. Murray, 372 N.E.2d 568, 43 N.Y.2d 417, 401 N.Y.S.2d 781 (N.Y.1977).

6. Littleton v. Kincaid, 179 F.2d 848, 858 (4th Cir. 1950), cert. denied, 340 U.S. 809, 71 S.Ct.

38, 95 L.Ed. 595 (1950); Trafton v. Youngblood, 69 Cal.2d 17, 69 Cal.Rptr. 568, 442 P.2d 648, 656 (1968); Daniels v. Paddock, 145 Mont. 207, 399 P.2d 740, 747 (1965).

7. Gold v. Greenwald, 247 Cal.App.2d 296, 55 Cal.Rptr. 660, 668 (1966); Baye v. Grindlinger, 78 A.D.2d 690, 432 N.Y.S.2d 624, 625 (App.Div.

number 4 was not superfluous and the court was justified in ordering rescission when the jury answered the interrogatory in the negative.

The obligation to disclose the legal consequences of the documents utilized was, under the evidence presented, a matter of some importance to this case. The Sears testified that they desired not to be personally liable for the balance of the purchase price beyond the downpayment, and that they believed that this was the way the transaction had been structured. Their request that Norlite be the purchaser rather than themselves lends a measure of credibility to their position. The final sale documents included, as we have mentioned, an "Indemnity Agreement" which was appended to the Deed of Trust. Under the Indemnity Agreement, the Sears guaranteed the obligations of Norlite under the Deed of Trust.[8] The twelfth numbered clause at the bottom of the fourth page of the Deed of Trust lists as one of Norlite's obligations of the Deed of Trust, the performance of "all covenants, conditions, obligations and provisions of" the note. In this indirect manner, the Sears became guarantors of the note. The Sears testified that the significance of the Indemnity Agreement was not explained to them and that they did not realize that this was the legal consequence of the agreement. Reasonable jurors could have so concluded.

■■■■ The Millers also challenge interrogatory number 4 on the grounds that it is confusing and inartfully drafted. However, the Millers specifically acquiesced in the court's formulation of the interrogatory and accordingly failed to preserve these points for review. *Alaska International Industries v. Musarra*, 602 P.2d 1240, 1247 n.25 (Alaska 1979); *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 91 (Alaska 1974). We decline to review claims not raised below except to the extent that they may constitute plain error. Plain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted. *City of Nome v. Ailak*, 570 P.2d 162, 171 (Alaska 1977); *Holiday Inns of America, Inc. v. Peck*, 520 P.2d at 91.

Here, the Millers argue that interrogatory number 4 should have stated: "Did Mr. Miller either fully explain to the Sears the significance and legal effect of each *material* term . . . ?" They urge that the failure to include "material" in the interrogatory lead the jury to believe that all terms had to be explained. They also claim that this confusion was aggravated by the testimony of an attorney expert witness who explained and criticized the various terms of the sale documents.

The expert witness testified extensively as to ambiguities in the conveyancing documents which were adverse to the Sears' interests. A few of these points could be considered trivial. However, the Sears testified that they misunderstood the legal effect of the documents on two matters: 1) whether the SBA payments were included in the $2,500.00 monthly payment and 2) the effect of the indemnity agreement on their personal liability. Both of these misconceptions of the legal effect of the documents are material and were alluded to several times during the course of the trial.

1980); *see also Littleton v. Kincaid*, 179 F.2d 848, 858 (4th Cir. 1950), *cert. denied*, 340 U.S. 809, 71 S.Ct. 38, 95 L.Ed. 595 (1950); *Trafton v. Youngblood*, 69 Cal.2d 17, 69 Cal.Rptr. 568, 442 P.2d 648, 656 (Cal.1968); *Melson v. Michlin*, 223 A.2d 338, 344 (Del.1966); *Goldman v. Kane*, 3 Mass.App. 336, 329 N.E.2d 770, 773 (Mass.App.1975); *Daniels v. Paddock*, 145 Mont. 207, 399 P.2d 740, 747 (Mont.1965); Restatement (Second) Contracts § 315 (Tent. Draft 11, April 15, 1976).

**8.** The Indemnity Agreement reads in full as follows:

Comes now, DALLAS E. SEARS and SARA P. SEARS, individually and personally, for and in consideration of the beneficiaries conveying said property to the corporation owned by them and guaranty on their own behalf all obligations, conditions and terms hereof and agree personally and individually to stand responsible in lieu of the corporation if, for any reason whatsoever, NORLITE, INC. is unable to meet its obligations and agreements herein.

Conversely, the Sears did not stress their lack of understanding of the more technical ambiguities in the documents testified to by the expert. For these reasons, we do not think it likely that the jury held Mr. Miller to a standard requiring the disclosure of the immaterial legal effects of the documents.

■ The Millers further contend that interrogatory number 4 conflicts with the court's instruction on fiduciary duty.[9] As we have explained, interrogatory number 4 embodies important aspects of an attorney's obligation to his client.[10] We find no conflict or error.

■ The Millers also contend that the record does not disclose a basis upon which to sustain a verdict in favor of Norlite, Inc. against the Millers. The case was submitted to the jury under instructions which did not permit separate treatment of the Sears and Norlite. The Millers did not object to the instructions on the basis that separate treatment of the defendants was required. This point must therefore be regarded as waived.[11]

## PRESUMPTION OF INVALIDITY AND BURDEN OF PROOF

The Millers claim that the court erred in giving the following instruction:

9. The court instructed the jury:

A fiduciary duty is owed by an attorney to his client. Its nature is very delicate and exacting; it involves a high degree of fidelity and good faith on the part of the attorney for the best interests of his client. It is a purely personal duty typically involving the highest personal trust and confidence of the client in his attorney.

The fiduciary duty owed by an attorney to his client requires that the attorney may not take selfish advantage of his client's trust, or deal with his client in such a way as to benefit himself at the expense of his client.

10. *See* pp. 1188–1189, *supra*.

11. Alaska R.Civ.P. 51(a) provides in relevant part:

(a) *Requested Instructions—Objections.*
... No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinct-

If you find by a preponderance of the evidence that Mr. Miller owed a fiduciary duty to the Sears or Norlite, Inc. at the time of discussing and completing the sale of his property, then you must presume that by bargaining with them he breached his fiduciary duty. This presumption may be overcome by Mr. Miller if he proves by clear and convincing evidence that he did not breach his fiduciary duty.

No objection was made to this instruction and thus only plain error review is appropriate. *Holiday Inns of America, Inc. v. Peck*, 520 P.2d at 90.

■ Once the Sears established that an attorney-client relationship existed at the time of the sale, the burden of proof was properly placed upon the Millers. This is in accord with general tenets of the duties of a fiduciary and ensures that the attorney fiduciary discharges his general duties of loyalty and fair play.[12] Nor is it clearly wrong to impose a standard of proof higher than a preponderance of the evidence. Other jurisdictions have found proof by clear and convincing evidence to be the appropriate standard.[13]

■ The Millers also object to the use of the word "presumption" in the instruction. Although Alaska Rule of Evidence 301(a)

ly the matter to which he objects and the grounds for his objection....

12. As one commentator observes:

The public policy behind the presumption is so strongly established that the burden of proof remains upon the attorney despite other countervailing presumptions and policies. R. Mallen, J. Levit, Legal Malpractice § 98 at 143–44 (1977). *See* G. Bogert, Trusts & Trustees § 544 (2nd ed. 1978).

13. *See Gerlach v. Donnelly*, 98 So.2d 493, 498 (Fla.1957); *Smyrna Developers, Inc. v. Bornstein*, 177 So.2d 16, 18 (Fla.App.1965); *Flanagan v. DeLapp*, 533 S.W.2d 592, 595–96 (Mo. 1976); *Laspy v. Anderson*, 361 S.W.2d 680, 682 (Mo.1962); *Daniels v. Paddock*, 399 P.2d 740, 747 (Mont.1965); *Van Orman v. Nelson*, 427 P.2d 896, 902 (N.M.1967) ("heavy burden").

Under general principles applicable to fiduciaries, a fiduciary must bear a heavy burden to discharge his burden of proof. G. Bogert, *supra* note 12, at 448.

disapproves of the use of "presumption" in a jury instruction, the rule is not applicable to the case at bar because it was not in effect at the time of this case. Accordingly, we find no plain error in the giving of the instruction. *City of Nome v. Ailak*, 570 P.2d at 171; *Holiday Inns of America, Inc. v. Peck*, 520 P.2d at 91.

## COUNTERCLAIM AS TO FRANCES MILLER

Frances Miller further urges that the trial court erroneously denied her pretrial motion to dismiss the Sears' counterclaims against her. She accompanied her motion with deposition testimony by both Dallas and Sara Sears that established that Frances Miller had made no misrepresentations of fact to them. In opposition, the Sears contend that Eugene Miller's conduct should be imputed to Frances on an agency theory.

 It is clear that a transaction entered into by a principal is subject to rescission for the fraud and misrepresentation of the agent.[14] This rule applies when a fiduciary breaches his obligations and the innocent principal gains thereby. Thus, the trial court did not err in denying the motion to dismiss.

 Frances also contends that the court should have granted her motion for judgment n. o. v. because, as she argues, there was no evidence to support a finding of any breach of duty on her part. As the case was presented to the jury, it was assumed that Eugene was acting as agent for Frances because the instructions called for a finding in favor of the Sears if Eugene was found to have violated his duties as a fiduciary. This aspect of the instructions was not objected to, and therefore we consider the point to have been waived. Alaska Rule of Civil Procedure 51(a). Furthermore, the only reasonable conclusion one could draw from the evidence presented was that Eugene was acting for Frances as well as for himself in dealing with the Sears. Thus, even if there had been an objection that the instructions assumed an agency relationship, the objection could properly have been overruled.

## MISCELLANEOUS PRE-TRIAL MOTIONS

The Millers filed a pre-trial motion for a protective order to exclude the testimony of Sara Sears and to prevent the introduction of the corporate minutes of Norlite into evidence. The motion was not acted upon by the court and we see nothing in the record showing that the Millers drew the court's attention to it. The minutes were not introduced into evidence. Finally, no objection was raised to Sara Sears' testimony on the grounds raised in the motion. Consequently, we fail to see what the Millers want us to review and we find no error.

Upon the Millers' request, the court ordered the Sears to file a more definite statement of their counterclaim. The defendants filed their First Amended Counterclaim seven months later on June 12, 1978. The Millers moved to strike the First Amended Counterclaim. The court denied the motion and the Millers appeal that ruling.

 Trial courts have broad discretion in deciding whether to grant leave to amend. *Wright v. Vicaryous*, 598 P.2d 490, 495 (Alaska 1979). A comparison between the original counterclaim and its amended version reveals that they both assert the same legal theories; the latter simply makes more factual assertions. Thus we see no merit in the Millers' claims of prejudice and rule accordingly.

 The Millers filed a motion to continue the trial date on August 10, 1978, and

---

**14.** Restatement (Second) Agency § 259(1) (1958) states:

> *Rescission of Transaction for Misrepresentations of Agent*
>
> (1) A transaction into which one is induced to enter by reliance upon untrue and material representations as to the subject matter, made by a servant or other agent entrusted with its preliminary or final negotiations, is subject to rescission at the election of the person deceived.

the motion was denied September 15, 1978. Because their motion to strike the First Amended Counterclaim was denied July 14, 1978, they claim they were not afforded enough time to engage in adequate discovery. Discovery closed on December 4, 1978; we think the Millers had sufficient time to conduct discovery and the trial court did not abuse its discretion in so ruling.

■ Finally, the motion to sever the trial of the Millers' complaint from the trial of the counterclaims was properly denied. Motions for consolidation or severance of claims under Civil Rule 42(a) and (b) are reviewable for abuse of discretion. *See, e. g., Brown v. Hawkins*, 418 P.2d 28, 31 (Alaska 1966). Separate trials are appropriate to further "convenience or to avoid prejudice" or when the separate trials will be "conducive to expedition and economy." Alaska Rule of Civil Procedure 42(b). Because the Sears raise as defenses to the Millers' action essentially the same issues of fact that underlie their counterclaims, trying the two claims together was "conducive to expedition and economy." We find the Millers' claims of prejudice unconvincing and, consequently, the court did not abuse its discretion in denying the. motion to sever.

## MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR A NEW TRIAL

■ We reject the Millers' argument that the court erred in not granting their motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. That motion was based on the substantive arguments which we have discussed and rejected in this opinion. We note, however, that the Millers failed to move for a directed verdict before the jury retired for deliberations. The clear language of the rule is that a judgment notwithstanding the verdict may not be granted unless it is preceded by a motion for a directed verdict. Alaska Rule of Civil Procedure 50(b); 5A J. Moore, *Federal Practice and Procedure* § 50.01 [13] at 50–14; § 50.08 at 50–85–7 (1980).

## RESTITUTION

After the jury trial, an evidentiary hearing was conducted to decide the question, as the court put it, "of who owes what to whom as a result of the rescission." Following the conclusion of the hearing and arguments of counsel the court entered a memorandum decision and order concluding that the Sears owed the Millers a balance of $1,857.00.

The court found that the Millers had received benefits of $76,922.00 as a result of the transaction, consisting of a $60,000.00 down payment, $15,422.00 in principal and interest paid by the Sears to the Small Business Administration and $1,500.00 paid by the Sears for new carpeting in a part of the building. The court found that the Millers had lost as a result of the transaction $78,779.00, consisting of the net reasonable rental value of the property for seventeen months, $65,875.00; the cost to restore the walls and the interior of the building which had been altered, $8,490.00; the replacement cost less depreciation for carpet for the residential portion of the building $2,909.00; damage through neglect to the lawn and shrubbery of $1,005.00; and a $500.00 rental deposit paid by a tenant.

The court found that the Sears had custody of the property from November 1976, through August 1978, noting that the Sears "gave legal notice of cancellation of the contract by way of a letter dated March 12, 1977," but concluded that "[c]ancellation did not occur at that time." The court found that Mr. Sears began remodeling the residential portion of the property as soon as possession was received, continued doing so for two months, and could have completed remodeling and had the property available for commercial rental by the end of March of 1977. The seventeen months charged to the Sears' for lost rental value commenced from April 1, 1977, and terminated August 31, 1978. The court also found that the portion of the property which was already used for commercial purposes was rented for seventeen months and generated gross rental income of $33,660.00. The Sears had

expenses of some $12,512.94 which were found to be of benefit to the property for such items as utilities, insurance, heating, oil, taxes, permits and some labor costs.

The Sears argue that the court erred in charging them with the fair rental value of the property after they gave notice of rescission and offered to restore possession to the Millers. They contend that they should only pay actual receipts ($33,660.00), less expenses ($12,512.94), a net sum of $21,-147.06. We agree.

A purchaser of real property who is innocent of any wrongdoing leading to the claim for restitution has a very limited obligation toward the property after he makes a timely offer to restore it to the seller, and the offer is refused. He may upon reasonable notice, abandon the property,[15] and may decline to make expenditures necessary to protect it against foreclosure.[16] It follows, after the restoration offer is made and refused, that the purchaser is under no duty to see to it that the property is utilized for the benefit of the seller. However, the purchaser is not required to abandon the property after the offer of restoration is declined. He may, for example, protect the property but not actually use it. In such

case, he is not responsible to the seller for the fair rental value of the property, as he has received no benefit. In the event the purchaser uses the property, he must pay the seller for the reasonable value of his use. Where the property is a residence, occupied as such by the purchaser, this is measured by the fair rental value of the property.[17] If, on the other hand, the property is commercial in nature, the purchaser must pay his net receipts, for those measure the extent to which he has been benefitted.[18] However, if his net receipts are greater than the fair rental value of the property, then the latter is the proper measure.[19]

Applying these principles to the facts of this case necessitates a modification of the money judgment. The Sears did not personally occupy the premises as their residence. They should be charged with net proceeds, $21,147.06, rather than net fair rental value, $65,875.00.

The Sears also argue that the court erred in finding that they first offered to restore the property to the Millers on March 12, 1977. They contend that such an offer was made in their letter of January 12,

**15.** *Christakos v. Lockwood*, 194 F.2d 897, 898 (D.C.Cir.1952); *Schuler v. Humphrey*, 198 Or. 458, 257 P.2d 865, 880–81 (1953); *Weaver v. Blockberger*, 31 Wash.2d 877, 199 P.2d 589, 593 (1948).

**16.** *Limoli v. Accettullo*, 358 Mass. 381, 265 N.E.2d 92 (1970). The Restatement of Restitution § 67, Comment a (1937) provides:

If an offer of restoration to the other party has been made and refused by the other, the one seeking rescission is only under a duty of reasonable care with reference to the physical condition of what has been received. He is under no duty of protecting the subject matter against foreclosure by a mortgagee or against adverse suits by third persons. *With respect to land he is under no duty to remain in possession or to protect it from harm done by the weather or by third persons. . . .* [Emphasis added].

**17.** *Kent v. Clark*, 20 Cal.2d 779, 128 P.2d 868, 872 (1942); *Farmer v. Groves*, 276 Or. 563, 555 P.2d 1252, 1255 (1976).

**18.** *Mahurin v. Schmeck*, 95 Ariz. 333, 390 P.2d 576, 582 (1964); *Schuler v. Humphrey*, 198 Or.

458, 257 P.2d 865, 881 (1953); *Widmer v. Leffelman*, 187 Or. 476, 212 P.2d 737, 746 (1949).

**19.** *See West v. McCoy*, 70 Cal.App.3d 295, 138 Cal.Rptr. 660, 665 (1977) Restatement of Restitution § 157, Comment d (1937) provides in relevant part:

If the recipient was not tortious and was not more at fault than the other he is under no duty of paying for the value of the use unless he used the land, in which case he is required to pay the reasonable value of the use or what he received therefrom, at his election (see illustration 5).

Illustration 5 provides:

A transfers Blackacre to B as a gift, doing so as a result of a basic mistake for which B was in no way responsible. B does nothing with the land for the period of a year, at the end of which time, the facts being discovered, B reconveys the land to A. A *is entitled to no compensation from B for the use of the land although the land would have been profitable if used or rented during the period (and B is entitled to taxes upon the land paid by him. . . .)*

1977, from the Sears to the Millers. The letter of March 12, 1977, is direct and unambiguous. It states:

> You are hereby advised that [the] contract of sale ... is hereby cancelled.

It contained a clear offer to restore the property. By contrast, the letter of January 12 did not contain language of present cancellation or an explicit offer to restore the property.[20] It was sent following a series of requested modifications by the Sears which had been agreed upon by the Millers. Eugene Miller promptly answered the January 12th letter, rejecting the proposal that it contained. Thereafter the Millers sent several letters to the Sears suggesting prospective tenants and Sara Sears responded to at least one of them indicating that she was still trying to rent the property, but as yet had met with no success. Under these circumstances, we think that the court did not err in concluding that the offer of restoration was first made in the letter of March 12.

■ The Sears challenge the trial court's award to the Millers of $8,490.00 as the cost to restore the walls and interior of the building and $2,909.00 as the replacement cost less depreciation for carpeting which had been removed. Their argument here is that it was inconsistent of the court to charge the Sears for fair rental value based on the use of the property for commercial purposes and also award the challenged sums which are necessary to restore the property to its prior condition as a residence. This inconsistency, however, has been eliminated as a result of our opinion. When the Sears gave notice of their intent to rescind the contract and their offer to restore the property to the Millers, they were obligated to return the property in substantially as good a condition as when they received it, or its value. *See* Restatement of Restitution §§ 65, 66 (1937). The

court found that the uncompleted remodeling "unquestionably adversely affected the value of the property...." Because that finding is supported by evidence, we find no error.[21]

■ The Sears claim that the court erred in concluding that labor done by Dallas Sears had not been shown by a preponderance of the evidence to have improved the property. The Sears do not refer us to any part of the record which shows that Mr. Sears' labor expenses did contribute to improvements of the property. Because this finding is not clearly erroneous, it must stand. Alaska Rule of Civil Procedure 52(a).

## PREJUDGMENT INTEREST

The Sears also contend that the court erred in failing to grant them prejudgment interest on their $60,000.00 down payment, while awarding interest to the Millers on the sum of $1,857.00 from November 1, 1976.

■ We agree that the court erred in not awarding the Sears prejudgment interest on their down payment. In a case such as this, based on breach of a fiduciary duty, the interest should run from the time each payment was made.[22] Likewise, interest should be allowed on each payment to the Small Business Administration from the time it was paid. However, as to the $1,500.00 paid by the Sears for new carpeting in a part of the building, interest should not run until the benefit therefrom was potentially available to the Millers. That time was the date of the offer of restoration of the property.

■ The Millers are also entitled to prejudgment interest on the amounts credited to them. Prejudgment interest on the rental receipts should be assessed as of the time of receipt, after making necessary deduc-

---

**20.** The January 12 letter is set forth in full in note 4, *supra*.

**21.** The Sears are not necessarily liable for the cost of restoration if they can show that the value of the property decreased by a lesser figure. *See* Restatement of Restitution § 66,

Comment f; § 159, Comment a (1937). No such evidence was introduced and thus we will not disturb the trial court's findings.

**22.** *See* Restatement of Restitution § 156, Comment a (1937).

tions for expenses then accrued. Interest on the restoration costs should be assessed as of the time of the offer of restoration.

## EXPERT WITNESS COSTS AND ATTORNEY'S FEES

The Millers challenge the court's award of $2,289.58 to pay the fees of expert witnesses who testified on behalf of the Sears, arguing that Administrative Rule 9(c) limits the allowable taxable cost to expert witnesses to $25.00 per hour. Administrative Rule 9(c) provided at the time of trial:

(c) *Expert Witnesses.* A witness called to testify as an expert witness shall receive additional compensation to be fixed by the judge with reference to the value of the time employed and the degree of learning or skill required; but such additional compensation shall not exceed $25.00 per hour while so employed and testifying, except as otherwise provided in these rules. No more than 3 expert witnesses shall be allowed to testify on each side as to the same issue in any given case, unless the judge trying the case, in his discretion, permits an additional number of witnesses to testify as experts.[23]

Our general cost rule, Rule 79(b)[24] expressly provides for the allowance of many routine cost items, such as filing and service fees and deposition costs. It does not mention witness fees, but it does provide generally that other expenses necessarily in-

curred shall be allowed. However, Civil Rule 83 deals specifically with the payment of fees for witnesses and provides that the Administrative Rules are to govern concerning that subject.[25]

■ Because it is a fundamental principle of construction that where two enactments conflict, the one which is more specific is to govern,[26] we conclude that Civil Rule 83 and Administrative Rule 9(c) govern the taxing of costs for witness fees rather than the general catchall clause of Civil Rule 79(b).

It follows that the award of costs must be modified. Absent extraordinary circumstances, such as bad faith or reprehensible conduct,[27] not existing here, the prevailing party may receive as costs only those expert witness fees specified in Administrative Rule 9(c); fees for an expert who does not testify, or fees for necessary preparation time for an expert who does testify may not be recovered. The intent of rule 9(c) is to limit the fees which can be taxed as costs to those specified in the rule. Costs in excess of those specified or which do not meet the conditions of the rule are, like many other litigation costs, not recoverable from the losing party.

The Millers' arguments concerning attorney's fees are premised on the fact that such fees were awarded following the jury trial, but before the evidentiary hearing at which the Millers received an affirmative

**23.** Administrative Rule 9(c) has now been recodified and now appears as Administrative Rule 7(c).

**24.** Alaska Rule of Civil Procedure 79(b) provides:

*Items Allowed as Costs.* A party entitled to costs may be allowed premiums paid on and expenses of posting, undertakings, bonds or security stipulations, where the same have been furnished by reason of express requirement of law or on order of the court; the necessary expense of taking depositions for use at trial and producing exhibits; the expense of service and publication of summons or notices, and postage when the same are served by mail; filing fees and other charges made by the clerk of the court and fees for transcripts required in the trial of a case in the superior court. In addition to the items

allowed as costs by law and in these rules, a party shall be allowed any other expenses necessarily incurred in order to enable a party to secure some right accorded him in the action or proceeding.

**25.** Alaska Rule of Civil Procedure 83 provides:

*Fees: Witnesses—Physicians—Interpreters and Translators.* The payment of fees and mileage for witnesses, and for physicians and interpreters and translators, shall be governed by the rules for the administration of the courts.

**26.** *Matter of Estate of Hutchinson,* 577 P.2d 1074, 1075 (Alaska 1978).

**27.** *See Malvo v. J. C. Penney Co., Inc.,* 512 P.2d 575, 588 (Alaska 1973).

award. The Millers' arguments are largely mooted by our opinion. In view of the changes in the judgment which are now required, the court is free to recalculate attorney's fees.

AFFIRMED in part; VACATED in part; and REMANDED.

COMPTON, J., not participating.

CONNOR, Justice, with whom COATS, Judge, joins, dissenting in part.

I disagree with the majority opinion as to the expert witness fees. I believe that the trial judge has discretion to award fees to an expert witness in excess of $25.00 per hour under that part of Civil Rule 79(b) which reads:

> In addition to the items allowed as costs by law and in these rules, a party shall be allowed any other expenses necessarily incurred in order to enable a party to secure some right accorded him in the action or proceeding.

Expert witnesses are frequently necessary to bring or defend a lawsuit. The fees of expert witnesses called by private litigants are a matter of negotiation between the expert and the litigant. It is well-known that these fees can vary greatly, depending upon the subject matter and the particular field of expertise as to which the expert may testify. The trial court needs to have the discretion to award expert witness fees in order for the prevailing party to recover some of the necessary costs of litigation. In my view, Civil Rule 79(b) gives the trial judge this authority.[1]

---

1. I note that Administrative Rule 7(c) (former Administrative Rule 9(c)) allows compensation to an expert witness not to "exceed $25.00 per hour while so employed *and* testifying." (Emphasis added.) The rule by its terms appears to only cover fees for expert witnesses while they are testifying. The rule does not appear to address what compensation, if any, the expert witness can receive for time necessarily spent which does not involve actually testifying.