McRENTALS, INC., Clinton G. Mc-Donald, Irene M. McDonald, Larry McDonald, and Sharon Brown, Appellants,

v.

David L. BARBER, Respondent.

No. WD 58248.

Missouri Court of Appeals, Western District.

Dec. 18, 2001.

Todd W. Ruskamp, Kansas City, for appellant.

Dan C. Sanders, Kansas City, for respondent.

Before SPINDEN, P.J.,
BRECKENRIDGE and NEWTON, JJ.

**PATRICIA BRECKENRIDGE, Judge.**

This appeal involves an employment and stock option agreement negotiated between McRentals, Inc., Clinton G. McDonald, Irene McDonald, Larry McDonald, and Sharon Brown[1] and David L. Barber, attorney for Clinton and Irene McDonald and McRentals. Pursuant to the agreement, Mr. Barber agreed to manage McRentals' rent-to-own stores, and, in return, the McDonalds contracted with Mr. Barber for a 20–year employment term as president of McRentals, giving him the option to purchase stock in the company. Almost four years after entering into the agreement with Mr. Barber, the McDonalds filed suit to rescind the agreement, asserting claims for breach of fiduciary duty, legal malpractice, injunctive relief and declaratory judgment. The McDonalds alleged that the agreement was subject to rescission because (1) an attorney-client relationship existed between the parties, (2) Mr. Barber asserted undue advantage over them during contract negotiations, and (3) the agreement was unfair and unreasonable. Mr. Barber filed his answer, asserting the affirmative defenses of laches and estoppel, and filed counterclaims for breach of contract and breach of covenant of good faith and fair dealing. The trial court entered judgment against the McDonalds on their claims and entered judgment in favor of Mr. Barber in the amount of $989,264 on his counterclaims for breach of contract and breach of covenant of good faith and fair dealing. The McDonalds appeal.

In their first point on appeal, the McDonalds claim the trial court erred in that its finding that Mr. Barber did not take undue advantage of the McDonalds during the negotiation and execution of the employment and stock option agreement was either a misapplication of the law or against the weight of the evidence. In their second point, they claim that the trial court misapplied the law when it determined that the terms of the agreement were fair and reasonable. Because the weight of the evidence supports the trial court's finding that Mr. Barber did not exercise undue advantage over the Mc-

---

1. We refer to parties collectively as the Mc- Donalds.

Donalds, and the trial court did not misapply the law in finding that there was no undue advantage and the agreement was fair and reasonable, the judgment is affirmed.

### Factual and Procedural Background

The evidence established that Clinton McDonald is an astute businessman. He has a bachelor's degree in accounting and a master's degree in business administration. He is a retired certified public accountant and has been involved in purchasing, operating and selling various businesses since 1972.

In 1987, Clinton McDonald formed a corporation known as McRentals, Inc. Initially, McRentals consisted of two stores but now has grown to 18 stores engaged in the business of renting and leasing household goods and furnishings to the public. The stores are located in various cities throughout Missouri. Clinton McDonald is the majority shareholder and chairman of the board of McRentals. His wife, Irene McDonald, and their children, Larry McDonald and Sharon Brown, are minority shareholders of McRentals.

In 1992, Clinton and Irene McDonald retained Mr. Barber to assist them in estate planning. As part of that process, Clinton McDonald employed accountants at the Price Waterhouse accounting firm to assist in valuing McRentals. In a report dated April 1, 1993, Price Waterhouse valued and appraised the fair market value of McRentals at $1,043,000. When Clinton McDonald decided to sell McRentals and retire in August of that year, Clinton McDonald again contacted Mr. Barber. Mr. McDonald asked Mr. Barber if he could refer him to a business broker that could help him market McRentals, and Mr. Barber gave him the name of Jack Reda, a certified public accountant and business broker.

Clinton and Irene McDonald thereafter met with Mr. Reda. Mr. Reda agreed to provide professional consulting services, which included analyzing, pricing, valuing and marketing of McRentals. In November 1993, Mr. Reda prepared a written brochure and summary, which listed in detail the assets of the company and summarized the historical income and expenses for McRentals. The brochure and summary were to be given to prospective purchasers. Mr. Reda acted as the lead negotiator, working with Mr. Barber who was the lawyer on the transaction.

In the meantime, Clinton McDonald received an offer from Charles Linn to purchase McRentals for $1 million, but Clinton McDonald declined the offer. Next, a Price Waterhouse employee offered Clinton McDonald $1.2 million for the business, but Clinton McDonald declined that offer, too. With respect to these purchase offers, Clinton McDonald handled the negotiations with Linn and the Price Waterhouse employee without the assistance of counsel or his business broker, Jack Reda.

In November 1993, Mr. Reda identified James H. Steinheider and James. L. Osborn as potential buyers of McRentals. Mr. Reda helped draft and negotiate a letter of intent on behalf of the McDonalds, and he recommended that Clinton McDonald sign the letter of intent. Mr. Barber continued to act as counsel for Clinton and Irene McDonald in reviewing contract documents, including the letter of intent in connection with Mr. Steinheider and Mr. Osborn's offer to purchase McRentals. At Mr. Barber's suggestion, McDonald also hired Gary Barnes of the law firm of Husch and Eppenberger to help with the review and drafting of the contract documents.

On January 10, 1994, Clinton McDonald, Mr. Steinheider, and Mr. Osborn executed

and signed a non-binding letter of intent. Pursuant to the letter of intent, Mr. Steinheider and Mr. Osborn proposed to purchase McRentals for $2.4 million—$1 million cash and $1.4 million to be paid out over eight years pursuant to a promissory note secured by a first lien on the furniture, fixtures and inventory being sold by the rent-to-own stores. The letter of intent also permitted Mr. Steinheider and Mr. Osborn to receive reasonable salaries and benefits, but their salaries could not exceed $150,000 for the 1994 calendar year. Clinton McDonald believed that the purchase price offered by Mr. Steinheider and Mr. Osborn was fair and reasonable.

On February 7, 1994, Mr. Reda advised Clinton McDonald that Mr. Steinheider was unable to obtain financing to complete the purchase of McRentals. Mr. Steinheider's financial backer, Mr. Osborn, had lost interest in acquiring McRentals. Although Mr. Steinheider made additional proposals to purchase McRentals, Clinton McDonald became frustrated with Mr. Steinheider because Mr. Steinheider kept making demands for certain guarantees and the demands were completely unacceptable to Clinton McDonald. Finally, in February 1994, Clinton McDonald told Mr. Barber he was fed up with the negotiations with Mr. Steinheider.

In late February or early March 1994, Clinton McDonald approached Mr. Barber and asked Mr. Barber, "Why don't you consider" purchasing McRentals? Several days later, Mr. Barber told Clinton McDonald that he might have an interest in purchasing McRentals. Mr. Barber specifically told McDonald, however, "I cannot represent you and I'm not going to feel offended if you go talk to your own lawyer."

Initially, Clinton McDonald and Mr. Barber intended that the purchase by Mr. Barber be an asset-purchase transaction.

On March 10, 1994, Mr. Barber, Clinton McDonald and Irene McDonald met at a bank in Kansas City. Mr. Barber sought to obtain a loan to finance the purchase of McRentals, and the McDonalds expressed a willingness to guarantee the loan. On March 15, 1994, Mr. Barber delivered to Clinton and Irene McDonald a draft of a contract to purchase McRentals. Pursuant to that contract, Mr. Barber agreed to purchase the assets of McRentals for $2.5 million payable with a bank loan of $1.5 million at closing and, upon repayment of the loan, a five percent royalty was payable on gross sales until an additional one million was paid. Mr. Barber and Clinton and Irene McDonald met at a restaurant in Sedalia to discuss the terms of Mr. Barber's purchase offer.

During this same period, Mr. Barber also talked to Clinton McDonald about Kevin Fryer's interest in purchasing the business, and Mr. Barber prepared a cover letter and confidentiality agreement to send to Fryer on behalf of Clinton McDonald. Mr. Barber also had discussions with Mr. Reda about a counteroffer made by Mr. Steinheider. Mr. Barber said that he then talked to Clinton McDonald and told him that Mr. Reda needed to be told about the situation. Mr. Barber also said that he did not feel comfortable terminating Mr. Reda because he did not think it was his place to do so. In response, Clinton McDonald told Mr. Barber, "Well, just prepare something and send it down to me." On March 15, 1994, Clinton McDonald signed a letter, authored by Mr. Barber, to Mr. Reda. The letter said:

> I understand from Dave [Barber] that Jim Steinheider now has his money and is willing to raise his $1,750,000.00 cash and $2,100,000.00 total price and is very serious. I have given this careful thought and made an independent decision. I have decided I am committed to

my other deal and only if it did not close would I consider another offer from Jim.

On March 18, 1994, Mr. Reda sent a letter to Clinton McDonald expressing his regrets that he could not close the Steinheider deal, and telling Clinton McDonald to call him if he could be of any help to him in the future.

In the meantime, Mr. Barber learned that the bank was unwilling to lend him $1.5 million for the purchase of McRentals. Mr. Barber and Clinton McDonald thereafter began discussing various alternatives as to how Mr. Barber could purchase the business. On March 21, 1994, Mr. Barber submitted another proposed contract to purchase to Clinton McDonald. Pursuant to this contract, Mr. Barber would purchase the assets of McRentals for $2,875,000, payable by paying the McDonalds ten percent of the gross receipts of the company until the entire purchase price was paid.

Although Clinton McDonald repeatedly denied that he met with any attorney other than Mr. Barber concerning the negotiations with Mr. Barber, the evidence established that on March 22, 1994, Clinton McDonald met with attorney Adam Fischer in Sedalia to discuss Mr. Barber's contract to purchase. Clinton McDonald had previously retained Mr. Fischer to perform legal services on several occasions. On March 22, 1994, Clinton McDonald gave Mr. Fischer a copy of the proposed contract for his review, and Mr. Fischer then advised Clinton McDonald about his concerns with the contract. Mr. Fischer did not recommend one way or the other whether Mr. McDonald should sign the contract. Clinton McDonald told Mr. Fischer that the proposed purchaser of McRentals was "his lawyer or [that he] had used that lawyer in the past." Mr. Fischer said that he was not concerned that the potential purchaser was Mr. McDonald's lawyer.

After his meeting with Mr. Fischer, Clinton McDonald contacted Mr. Barber and told him that his attorney did not think that the proposed contract was specific enough and that it needed to be restructured. Mr. Barber asked whether he should talk to Clinton McDonald's lawyer, and Clinton McDonald said, "No."

In late March or early April 1994, Clinton McDonald and Mr. Barber began discussing a different format for the agreement regarding Mr. Barber's acquisition of McRentals. Specifically, they talked about an employment and stock option arrangement regarding McRentals. As a result of their discussions, the parties essentially agreed that Mr. Barber would be employed as president of the company, that Mr. Barber would receive a salary, benefits and bonuses, and that he would be given the option to buy the McDonalds' stock over time. In return, the McDonalds would retain ownership and control over the company until Mr. Barber purchased 100 percent of the stock. After these discussions, Mr. Barber drafted a proposed employment and stock option agreement and gave the draft, to Clinton McDonald for his review. Clinton McDonald contacted Mr. Barber with comments about the draft and Clinton McDonald and Mr. Barber then met in early April 1994 to discuss the terms of the proposed written agreement.

The agreement specifically provided that Mr. Barber would be employed as president for 20 years because Clinton McDonald told Mr. Barber that he wanted a firm commitment from Mr. Barber that he was going to work for McRentals for the rest of his career. The agreement also provided that Mr. Barber would receive a salary of $100,000 per year. In addition to salary and fringe benefits, the agreement

provided that Mr. Barber would have an option to purchase all outstanding shares of the company pursuant to a formula calculation set out in the contract. Clinton McDonald and Mr. Barber initially agreed that Mr. Barber's option price per share for the stock in the company would be based on two times the book value. During the review of the agreement, however, Clinton McDonald advised Mr. Barber that he wanted to increase the option price to 2.45 times book value.

The agreement also provided that Mr. Barber would receive certain mandatory bonuses each year once $2 million of income had been distributed to the McDonalds. Clinton McDonald and Mr. Barber also specifically discussed that the terms of the agreement would not obligate Mr. Barber to use his mandatory bonuses to purchase stock in McRentals. Clinton McDonald and Mr. Barber agreed that it was unknown as to when and how much Mr. Barber would receive in bonuses; that Mr. Barber would need to pay taxes on the mandatory bonus; that because Mr. Barber's salary was locked in at $100,000 a year, he may need additional money in the future to pay for his children's college education; and that he may want to share these bonuses with other key employees.

Clinton McDonald and Mr. Barber also discussed the provision allowing Mr. Barber to be terminated for just cause. The agreement provided that Mr. Barber could be terminated for just cause if he failed "to perform or observe any material term or obligation of his employment, not remedied within 10 days after written notice from the company[.]" Mr. Barber said that he wanted assurances from Clinton McDonald that if a problem arose he would have the opportunity to fix it. In the event Mr. Barber was terminated for cause, the agreement directed that Mr. Barber would forfeit all his stock in the company and forfeit all of his future rights to purchase stock in the company.

At the meeting, numerous changes were made in handwriting to the proposed contract as a result of Clinton McDonald and Mr. Barber's discussion.[2] Clinton McDonald and Mr. Barber also discussed a proposed paragraph of the agreement, which provided:

> Each of the parties hereto represents and warrants that (a) they have read this entire Agreement; (b) they have had an opportunity if they so desire to consult with counsel of their choice regarding this Agreement; and (c) they agree to be bound by the provisions of this Agreement.

Mr. Barber told Clinton McDonald at the meeting that he would prepare an expanded version of this paragraph to make it clear that Mr. Barber was not acting as the McDonalds' attorney in this transaction.

2. These changes included: "the date Barber would commence work as president of McRentals; how Clinton McDonald's business expenses would be reimbursed; that the mandatory bonuses for Barber would be paid no later than May 1 each calendar year; a provision that if Barber became disabled for more than 90 days he could be terminated and his option rights forfeited; the reference to Smithton Enterprises was changed to Smithton Pet Products; an acknowledgement that the $50,000 loan payable by Ozark Shores Pet Products, Inc., to the company was approved; restrictions as to distributions or payments between the company and a related party; a provision that distributions of income and profit should be made monthly, but at least quarterly; that a $100,000 non-recourse loan would be made to Barber to purchase 17 shares of stock each from Larry McDonald and Sharon Brown and that similar loans could be made in the future if so desired; increasing the stock option price from two times book value to 2.45 times book value; and a provision allowing Barber to share his bonuses and stock with other employees."

On April 8, 1994, Mr. Barber met with Clinton and Irene McDonald, Larry McDonald and Sharon Brown at Sharon Brown's house in Sedalia. At the meeting, Mr. Barber reviewed and discussed the employment and stock option agreement with all the parties, and each party received and retained a copy of the agreement. According to Mr. Barber, he "walked through [the] contract paragraph by paragraph" before the agreement was signed. Moreover, an additional handwritten change was made to the agreement concerning the salary/compensation to be paid to the McDonald family and how these payments would affect calculation of income distributions to the McDonald family in determining Mr. Barber's entitlement to the mandatory bonuses.

In addition, Mr. Barber read aloud, "word for word," a handwritten waiver to all the parties, which said:

Each of us acknowledge and agree (a) we have had an opportunity to consult with counsel of our choice and (b) we waive any conflict of interest which may exist such as by David Barber becoming an employee, stockholder and option-

holder and (c) we understand one lawyer cannot represent both sides of a transaction so we have not relied upon David Barber or his firm for legal advice in connection with this matter.

Mr. Barber said that he read the waiver aloud because he "wanted to make it crystal clear so there would be no misunderstanding" that he was not representing the McDonalds in the transaction. At the conclusion of the April 8, 1994, meeting, Clinton and Irene McDonald, Larry McDonald and Sharon Brown initialed each page of and signed the employment and stock option agreement and the handwritten waiver. The key provisions of the agreement provided:

(1) McRentals would employ Mr. Barber as president of the company for a twenty-year period, from April 14, 1994, through May 31, 2014, at $100,000 per year.

(2) Mr. Barber would receive certain mandatory bonuses each year once $2 million of income had been distributed to the McDonalds.[3]

---

**3.** In regard to the mandatory bonuses provision, the agreement provided: "The Company shall pay to the Employee guaranteed bonuses calculated as follows: (a) A total shall be maintained of all payments made on or after this date by the Company to Clinton, Irene, Larry and/or Sharon, and such total is hereafter referred to as 'total payments.' It being agreed such total payments shall include all payments and distributions (of whatever kind or character and whether taxable or tax free) made by the Company to any one or more of such four individuals. It also being agreed that any interest paid by the Company on borrowings that are paid out to Clinton, Irene, Larry and/or Sharon shall (along with such borrowings) be included in total payments. Also included in total payments are any distributions from or of Smithton Pet Products division to Clinton, Irene, Larry and/or Sharon. Excluded from total payments is Company expenses that are incurred personally by Clinton and then reimbursed by the Company to Clinton. (b) For each calendar year which precedes the calendar year in which total payments reach $2,000,000 the guaranteed bonus shall be *zero*. (c) For the calendar year in which total payments reach $2,000,000 and for each calendar year thereafter through and including the calendar year which precedes the calendar year in which total payments reach $3,000,000 the guaranteed bonus shall be 20% of the adjusted net income. (d) For the calendar year in which total payments reach $3,000,000 and for each calendar year thereafter through and including the calendar year which precedes the calendar year in which total payments reach $4,000,000 the guaranteed bonus shall be 34% of the adjusted net income. (e) For the calendar year in which total payments reach $4,000,000 and for each calendar year thereafter the guaranteed bonus shall be 50% of the adjusted net income."

(3) Mr. Barber would receive employee and fringe benefits.

(4) Mr. Barber could be terminated for "just cause," defined to include Mr. Barber's conviction of a felony or other crime involving dishonesty, Mr. Barber's knowingly exceeding his authority as an employee of the company, or Mr. Barber's failure to perform or observe any material term or obligation under the agreement that is not remedied within ten days after written notice.

(5) The McDonalds would continue to receive monthly or quarterly distributions of profits and, in addition, would be paid salary and other compensation per the schedule set forth in the agreement.

(6) Mr. Barber would have the first option to purchase all outstanding shares of the company during the contract term based on the company's adjusted book value times a multiple of 2.45, a multiple designated by Clinton McDonald.

(7) Clinton McDonald would serve as chairman of the board, and Mr. Barber, as an employee, would have no say in who serves as chairman of the board until he owned 100 percent of the stock.

(8) Mr. Barber, as president of the company, would be "vested with the power and authority to govern and manage the routine day-to-day business and affairs of the Company[.]" Mr. Barber was required "to observe and comply with the directions and restrictions as the Chairman of the Board may establish from time to time with regard to management of the Company." Mr. Barber agreed that the chairman of the board had final authority over all management decisions, except 12 "Major Decisions" that could be undertaken only with the mutual consent of Mr. Barber and the chairman of the board.

(9) Mr. Barber was required to operate and to manage the company "in its ordinary and usual manner as generally done in the past" and to make distributions of income and profits to the shareholders on a monthly, but at least quarterly, basis.

(10) Mr. Barber was restricted from liquidating or selling substantially all of the assets of the company, from opening any new place of business or closing any existing place of business without the chairman of the board's consent, and from taking "any other action which would render it impossible for the Company to continue its business or for the purpose and intent of this Agreement to be accomplished."

(11) The McDonalds were restricted from disposing of their stock except to Mr. Barber. Mr. Barber could dispose of his stock only after giving the Company written notice and a 30–day right of first refusal to purchase the stock on the same terms and conditions as the proposed purchaser.

After the signing of the agreement, Mr. Barber resigned as a shareholder of the law firm of Fairchild Stang and went to work for McRentals as its president on April 14, 1994. Clinton McDonald, Larry McDonald and Sharon Brown assisted Mr. Barber during the transition period, but then Clinton and Irene McDonald retired and purchased a home in Florida, and Larry McDonald and Sharon Brown pursued other interests. After the summer of 1994, none of the McDonald family worked for McRentals. Mr. Barber, however, would talk to Clinton McDonald by telephone a couple of times a month and would occasionally have lunch with him. Clinton McDonald also assisted Mr. Barber with the 1994 and 1995 tax returns for the business.

As president of McRentals from April 1994 through February 1998, Mr. Barber increased gross annual sales and revenue from about $2.5 million to about $3.5 million per year, increased the number of outstanding rental contracts from about 5000 to about 8000, and increased the outstanding contract balances (accounts receivable) on all rental contracts from about $2.5 million to about $3.5 million. During his tenure, Mr. Barber also opened two new rental stores and maintained corporate growth at an average of 11.12 percent per year. From April 1994 through February 1998, he distributed a total of $1,690,857.17 of income and profits to the McDonalds. Clinton McDonald, as chairman of the board, gave Mr. Barber annual discretionary bonuses ranging from $10,000 to $15,000 at the end of 1994, 1995, and 1996.

As president of McRentals, Mr. Barber worked with the company accountant, Mike Bizel, in connection with a 1994–1995 tax audit, wherein the Internal Revenue Service challenged the rent-to-own contracts, contending that the contracts were installment sales. Through Mr. Barber's and Mr. Bizel's efforts, they convinced the IRS to conclude the audit and concede that the rent-to-own contracts were not installment sales contracts. Mr. Barber also secured a worker's compensation refund of approximately $60,000 for the company in 1995.

In the fall of 1997, Mr. Bizel was given a copy of the 1994 employment and stock option agreement and, thereafter, raised concerns about the agreement with Clinton and Irene McDonald. When Irene McDonald related those concerns to her son, Larry McDonald, he sought the advice of an attorney. When Larry McDonald was not satisfied with the advice of that attorney, he solicited the recommendation of an attorney from a friend and eventually contacted the firm of Shook, Hardy and Bacon. Clinton McDonald then contacted Mr. Barber in November 1997 and asked Mr. Barber to telephone John Simpson, an attorney at the firm of Shook, Hardy and Bacon. On November 6, 1997, Mr. Barber met with Mr. Simpson, and Mr. Simpson informed him that the McDonalds had a list of changes they wanted made to the 1994 employment and stock option agreement. After that meeting, Mr. Barber telephoned Clinton McDonald, and Mr. McDonald told him that he did not like the terms of the 1994 agreement and demanded that the terms be changed.

On December 4, 1997, Mr. Barber again met with the McDonalds' attorney and discussed the possibility of obtaining financing to buy out the McDonalds' remaining stock in the company. Mr. Barber was told, however, "We're not interested in any buy-out and we don't want to talk about any potential sale until after the agreement is changed."

On December 19, 1997, Clinton McDonald wrote Mr. Barber a letter, which said:

This letter deals with certain matters related to the Employment and Stock Option Agreement (the "Agreement") between you and McRentals, Inc. (the "Company"). As you know, the Agreement states that "the President is to observe and comply with the directions and restrictions as the Chairman of the Board may establish from time to time, with regard to the management of the Company" and that "the Chairman of the Board shall have full authority over all management decisions." Section 2.1. Based on this authority, the following rules shall apply with respect to the management of the Company until you receive further notice from me in writing:

1. Starting with the month of November, 1997, all of the book earnings of the Company for each month shall be distributed to the shareholders of the Company within sixty (60) days after the end of the month.

2. To the extent not distributed prior to the end of 1997, all of the Company's book earnings for 1997 shall be distributed prior to the end of 1998.

3. The Company shall not establish any new store locations until further notice.

Also, we had discussed whether the Company should purchase the rental stores in Eldon and Clinton from Ozark Shores Pet Products, Inc. I have determined that the Company should not pursue this action at the present time.

Finally, I am requesting that the following changes be made to the Agreement:

1. The transfer restrictions in Section 3.10 should be relaxed to allow any member of the McDonald family to transfer shares to another member of the family or to a trust established for the benefit of any family member.

2. The stock option provisions in Article III of the Agreement should be amended to provide that you would not be allowed to exercise the option to acquire 50% or more of the stock of the Company without purchasing all of the stock of the Company.

3. Section 1.7 should specify that you would be required to purchase stock of the Company (on the terms specified in Article III) with any "mandatory bonus" money received from the Company.

4. The employment term under the Contract would be amended to expire in three years. The option to purchase stock of the Company would expire on December 31, 1997.

On January 7, 1998, Mr. Simpson sent a follow-up letter to Mr. Barber regarding Clinton McDonald's December 19, 1997, letter. Mr. Simpson told Mr. Barber that Clinton McDonald "believes that it is absolutely necessary to restructure the Agreement and to do so as soon as possible." Mr. Simpson said that Clinton McDonald wanted these changes:

1. Section 2.2 ("Major Decisions") shall be eliminated. This will make it clear that the Board of Directors will have final authority over all management decisions.

2. Article III shall be eliminated, except insofar as it imposes restrictions on the disposition of Company stock owned by you.

3. Section 1.7 should specify that you would be required to purchase stock of the Company (on the terms specified in the current Article III) with any "mandatory bonus" money received from the Company. Alternatively, the Company would be willing to discuss a new bonus arrangement.

4. The employment term under the Agreement would be amended to expire on December 31, 2000.

Mr. Simpson informed Mr. Barber that if he had not received a positive response from him by January 20, 1998, Clinton McDonald and McRentals would be required "to proceed with other remedies" to resolve this situation.

On February 13, 1998, the McDonalds placed Mr. Barber on paid leave and filed suit against Mr. Barber for breach of fiduciary duties and declaratory judgment. The McDonalds sought damages and the trial court's declaration that the employment and stock option agreement executed on April 8, 1994, was void. On the same day the McDonalds filed their lawsuit, the McDonalds' attorneys, a process server, Larry McDonald, and a locksmith went to

the corporate headquarters of McRentals in Lee's Summit, served Mr. Barber with the petition, demanded the keys to Mr. Barber's company van, escorted Mr. Barber from the building, and changed the locks to the doors of the corporate headquarters. On March 25, 1998, the McDonalds terminated Mr. Barber's employment and ceased all further compensation and distributions to him under the terms of the employment and stock option agreement. On May 14, 1998, Larry McDonald, now acting as Vice President of McRentals, sent Mr. Barber a letter informing Mr. Barber that he was terminated because he "breached certain fiduciary duties and obligations to McRentals, Inc. and the individual shareholders of the company concerning the negotiation and execution of the contract[.]"

Following a six-day bench trial, the trial court entered judgment against the McDonald family on their claims for rescission, declaratory judgment and injunctive relief and entered judgment in favor of Mr. Barber, in the amount of $989,264 on his counterclaims for breach of contract and breach of covenant of good faith and fair dealing. The trial court found that: (1) the 1994 employment and stock option agreement was valid and enforceable, (2) the terms of the agreement were fair and reasonable, (3) Mr. Barber did not take undue advantage or breach his fiduciary duties to the McDonalds during negotiations and execution of the agreement, (4) the terms of the agreement were discussed and explained to the McDonalds and the agreement was the product of an arm's length negotiation, (5) the McDonalds breached the agreement and their covenant of good faith and fair dealing by firing Mr. Barber and refusing to compensate him per the contract. Alternatively, the trial also found that estoppel and laches barred the McDonalds' claims. The McDonalds appeal.

## Standard of Review

 In a court-tried case, this court will affirm the trial court's judgment unless no substantial evidence supports it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's judgment will be set aside only with a firm belief that the judgment is wrong. *Id.* In reviewing the evidence, we view the evidence, along with all reasonable inferences, in the light most favorable to the trial court's judgment and disregard all contrary evidence and inferences. *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo.App.2000). As the trier of fact, the trial court determines the credibility of witnesses and is free to believe or disbelieve all or part of the witnesses' testimony. *Ken Cucchi Constr., Inc. v. O'Keefe*, 973 S.W.2d 520, 524 (Mo. App.1998).

## Attorney's Burden of Proof When Dealing with Client

 Before embarking upon a discussion of the McDonalds' points relied on, we note that the trial court determined that an attorney-client relationship existed between Mr. Barber and the McDonalds and that, in this appeal, Mr. Barber does not contend otherwise. Mr. Barber, therefore, owed a fiduciary duty to the McDonalds in entering into this agreement. *See Jo B. Gardner, Inc. v. Beanland*, 611 S.W.2d 317, 320 (Mo.App.1980) ("A fiduciary relationship exists between attorney and client."). Thus, because a fiduciary relationship existed, Mr. Barber bore the burden of proving that he took no undue advantage of the McDonalds in entering the 1994 employment and stock option agreement and that the terms of the agreement were fair and reasonable.

*Flanagan v. DeLapp*, 533 S.W.2d 592, 595 (Mo. banc 1976); *Gardner*, 611 S.W.2d at 321. "Imposition of this admittedly stringent burden upon attorneys serves to insure the integrity of the trust and confidence which clients repose in attorneys incident to the attorney-client relationship." *Gardner*, 611 S.W.2d at 321.

■ The duties imposed due to this fiduciary obligation are essentially codified in the Missouri Supreme Court's Rules of Professional Conduct for attorneys. Rule 4–1.8(a) prohibits an attorney from entering into business transactions with their clients unless certain safeguards are met. Rule 4–1.8(a) provides:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> > (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
> >
> > (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transactions; and
> >
> > (3) the client consents in writing thereto.

Although violations of Rule 4–1.8(a) do not create a private cause of action for a client, the rule provides guidance in determining the fiduciary duty owed to a client by an attorney. *See Greening v. Klamen*, 652 S.W.2d 730, 734 (Mo.App.1983). Thus, it is against this backdrop that we must examine McDonalds' claim that Mr. Barber breached his fiduciary duties to them.

### No Undue Advantage

■ In their first point on appeal, the McDonalds assert that the trial court erred in concluding that Mr. Barber did not take undue advantage of the McDonalds during the negotiation and execution of the employment and stock option agreement. In particular, the McDonalds contend that the trial court's verdict was against the weight of the evidence and that the trial court did not undertake the correct legal analysis in reaching its conclusion. We disagree.

Because of the attorney-client relationship, Mr. Barber bore the burden of proving that in regard to his agreement with the McDonalds "there was no undue advantage of the client[s], nor a breach of confidence, but that the client[s] understood well and acquiesced." *Shaffer v. Terrydale Management Corporation*, 648 S.W.2d 595, 607 (Mo.App.1983). As we previously noted, Rule 4–1.8(a) essentially codifies the fiduciary duties attorneys owe to their clients when attorneys enter into a business transaction with their clients, establishing the burden attorneys must meet to show that there was no undue advantage and the clients were sufficiently advised and knowingly entered into the transaction. Rule 4.18(a) requires that (1) the transaction between the attorney be fair and reasonable with all terms being disclosed and transmitted in writing to the client in a manner that can be understood by the client [4] (2) the client have a reasonable opportunity to seek the advice of counsel, and (3) the client consents in writing. With regard to the disclosure to the McDonalds, Mr. Barber had to make a disclosure that would enable them to deal at arm's length. *Shaffer*, 648 S.W.2d at

---

4. The fairness and reasonableness of the transaction and agreement is raised in the McDonalds' second point.

607. Mr. Barber, therefore, had to show by "clear proof" that his adverse interest was disclosed to the McDonalds and that such was "perfectly understood" by the McDonalds. *Portman v. Madesco Inv. Corp.*, 760 S.W.2d 457, 461 (Mo.App.1988).

The trial court concluded that Mr. Barber did not take undue advantage of the McDonalds during the negotiation and execution of the agreement and that the agreement was the product of an arm's length negotiation between the McDonalds and Mr. Barber. The trial court's findings were supported by substantial evidence at trial and were not against the weight of the evidence.

The evidence established that Clinton McDonald approached Mr. Barber about purchasing McRentals even though Mr. Barber was acting as his attorney. In response to Clinton McDonald's inquiry, Mr. Barber told him that he would be interested in purchasing McRentals but that he could not represent Clinton McDonald and that he would not be offended if Mr. McDonald talked to his own lawyer. Clinton McDonald responded by saying, "I understand that."

In the course of the month after Clinton McDonald approached Mr. Barber about purchasing McRentals, Clinton McDonald and Mr. Barber engaged in negotiations, which involved three different proposals concerning Mr. Barber's purchasing McRentals. The first proposal was unsuccessful because the bank was unwilling to lend Mr. Barber the money for the purchase. The second proposal Clinton McDonald rejected because his attorney, Adam Fischer, reviewed the contract and concluded that it was not specific enough and that it needed to be restructured.[5] The third employment and stock option proposal was the product of arm's length negotiation between the parties, which resulted in numerous changes to the agreement.

In regard to the third proposal, Mr. Barber gave Clinton McDonald a copy of the proposed employment and stock option agreement. Thereafter, the parties met in early April 1994 to review and discuss the terms of the proposed agreement. Throughout this process, Clinton McDonald had significant control over the terms of the agreement. He made numerous changes to the original draft. For example, he specifically requested the provision that Mr. Barber be employed as president of McRentals for 20 years because he wanted a firm commitment from Mr. Barber that he was going to work for McRentals for the rest of his career. Clinton also changed the option price per share for the stock in the company from two times the book value to 2.45 times the book value. Clinton McDonald also specifically discussed and agreed that the terms of the agreements should not obligate Mr. Barber to use his mandatory bonuses to purchase stock.

In addition to the numerous handwritten changes that were made to the proposed agreement as a result of Clinton McDonald and Mr. Barber's discussion, Clinton McDonald and Mr. Barber also discussed the conflict of interest waiver. At this meeting, Mr. Barber told Clinton McDonald that he would prepare an expanded version of this paragraph to make it clear that Mr. Barber was not acting as the McDonalds' attorney in this transaction.

At the April 8th meeting, the date the agreement was signed, Mr. Barber reviewed and discussed the agreement with

5. The trial court specifically found that Clinton McDonald's insistence that Barber was their sole attorney in this transaction was refuted by the "believable evidence" in this case.

all the parties and gave each party a copy of the agreement.[6] Mr. Barber then "walked through [the] contract paragraph by paragraph" before the agreement was signed. Mr. Barber also read aloud, "word for word," a handwritten waiver to all the parties. Mr. Barber read the waiver aloud because he "wanted to make it crystal clear so there would be no misunderstanding" that he was not representing the McDonalds in the transaction. The waiver specifically advised the McDonalds that they were acknowledging that they had the opportunity to consult an attorney, that they waived any conflict of interest that existed by Mr. Barber becoming an employee of McRentals, and that they understood that Mr. Barber did not represent them and that they were not relying on him for legal advice in regard to the agreement.

None of the McDonalds claim that any particular term of the agreement or the waiver was misleading or ambiguous, as was the term "employment" in *Shaffer*, 648 S.W.2d at 607. Instead, they complain about the "implications" of entering into the agreement. Clinton McDonald admitted that he read the contract and understood the contract and waiver before he signed them. Irene McDonald, Larry McDonald and Sharon Brown testified that they were aware when they signed the agreement that Mr. Barber would receive $100,000 a year to run the business, that Mr. Barber would be entitled to certain bonuses, and that Mr. Barber was given the right to purchase the company over time pursuant to the agreement. Irene McDonald and Sharon Brown testified that they thought the terms of the agreement were fair and reasonable when they signed the agreement. Larry McDonald testified

that he felt that the terms of the agreement were not necessarily fair and reasonable when he signed the agreement, but that he signed the agreement anyway on the advice of his father, Clinton McDonald.

Through this process, Mr. Barber made a full disclosure to the McDonalds both orally and in writing of the terms of the transaction. The terms of the agreement were written in a manner which could be reasonably understood by the McDonalds. In addition, Mr. Barber made a full disclosure to the McDonalds, orally and in the written waiver, of his adverse interests. He informed the McDonalds that they could seek the advice of independent counsel in the transaction and that he could not represent them in this transaction. The waiver presented to the McDonalds spelled out in clear terms this information, and all of the McDonalds signed the waiver. The McDonalds acted with full knowledge in consenting to the terms of the agreement, and, therefore, Mr. Barber did not take undue advantage of the McDonalds.

▬▬▬ The McDonalds assert, however, that, because Mr. Barber took an adverse position to them in the very transaction in which he had previously represented them, Mr. Barber's advantage was heightened because of their relationship of trust and confidence. Indeed, the attorney-client relationship is one of special trust and confidence. *Shaffer*, 648 S.W.2d at 605. As this court explained in *Shaffer*:

"From the free and intimate disclosures required by that relation, the attorney acquires, not only a full knowledge of this client's business and affairs, but of his necessities and weaknesses as well. His position is that of a confidential adviser and he naturally has great influ-

---

6. Although the McDonalds insisted at trial that Barber provided and retained the only copy of the April 8, 1994, agreement, the

McDonalds disclosed to the court at the conclusion of the trial the existence of multiple copies of the April 8, 1994, agreement.

ence over his client. To an unscrupulous man, the attorney's position, in many instances, offers great temptations to take advantage of the knowledge acquired to make gain for himself by preying upon his client's confidence or necessities. The law, therefore, very properly requires that all of the dealings between the attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness all transactions had between them."

*Id.* (quoting 2 MECHEM, TREATISE ON THE LAW OF AGENCY § 2289 *et seq.* (2d ed.1982)). An attorney, therefore, may not obtain an advantage for himself or herself from the dealings committed to him or her by the client unless the client has knowledge and consents. *Shaffer,* 648 S.W.2d at 605.

The McDonalds make much of the fact that, because Mr. Barber had represented Clinton McDonald and Irene McDonald in estate planning matters since 1992, Mr. Barber had full access to all information regarding their personal finances and the company's finances. They also point to the fact that Mr. Barber was involved in the negotiations regarding the sale of McRentals before Mr. Barber became interested in purchasing the business. They allege that because of his involvement, Mr. Barber gained "intimate knowledge" of the company and its value. The McDonalds speak only generally about information regarding their personal finances and do not identify any information regarding their personal finances that Mr. Barber knew and used to disadvantage them. In addition, the evidence does not establish that Mr. Barber had "intimate knowledge" of the value of the company that was not otherwise available to other interested buyers of McRentals. Jack Reda, the McDonalds' business broker, prepared a "Summary of the Proposed Sale of Certain Assets of McRentals, Inc.," to educate potential buyers as to the value of the business. The summary contained all the pertinent financial information concerning the operation, income and expenses of McRentals. All potential purchasers had access to this information, including Mr. Barber. That Mr. Barber had knowledge of other purchasers' offers also did not disadvantage the McDonalds, because Clinton McDonald admitted that he never disclosed his bottom line price for McRentals to Mr. Barber.

The McDonalds also claim that Mr. Barber had confidential information that Clinton McDonald was anxious to retire and that he was irritated by Mr. Steinheider's demands for guarantees. The fact that Clinton McDonald wanted to sell the business to retire was not shown to be confidential information that would give Mr. Barber an undue advantage. There was no indication that this information was not known to others who sought to purchase McRentals. Nor can this court see how the McDonalds were disadvantaged by the fact that Mr. Barber did not demand the same guarantees that Clinton McDonald was unwilling to give Mr. Steinheider.

Furthermore, when Clinton McDonald approached Mr. Barber about purchasing McRentals, Clinton McDonald, not Mr. Barber, decided that the Steinheider deal was not moving forward and that he was no longer interested in dealing with Mr. Steinheider. The McDonalds had knowledge of Mr. Barber's prior dealings with them, and they not only consented but also invited Mr. Barber to purchase McRentals.

■■■ The McDonalds also contend that Mr. Barber's statement to Clinton McDonald that "I cannot represent you and I'm not going to feel offended if you go talk to your own lawyer" did not remove the undue advantage that Mr. Barber had in negotiations with the McDonalds. They

also argue that the written waiver was inadequate because it was not signed until after the negotiations ended and the agreement was executed. In particular, the McDonalds rely on Rule 4–1.8(a), Missouri Supreme Court's Rule of Professional Conduct, and the Supreme Court's opinion in *In Re Snyder*, 35 S.W.3d 380 (Mo. banc 2000).

In *Snyder*, the Missouri Supreme Court considered the requirements of Rule 4–1.8(a) in an attorney disciplinary action. In that case, the attorney entered into fee agreements with two clients in which he acquired adverse pecuniary interests in the clients' residential properties. *Id.* at 381. As to both clients, the attorney became involved in litigation regarding the payment of the fees. *Id.* at 381–82. One of the cases became further complicated because the attorney represented the client in a bankruptcy proceeding and then filed a lien for his fees on the bankruptcy proceeds. *Id.* at 382. The Supreme Court held that the attorney did not fulfill the requirements of Rule 4–1.8(a) in either of the transactions with his clients. *Id.* at 383–84. In regard to the attorney's involvement in the bankruptcy case of one client, the court explained:

> Having acquired an adverse pecuniary interest in the subject matter of the bankruptcy proceeding, Respondent became obligated under Rule 4–1.8(a) to fully disclose, in a contemporaneous writing, how he would pursue securing his fees for the new and additional services being provided during this ongoing fiduciary relationship. Respondent should have disclosed his intent to file a lien on the proceeds from the sale of the property prior to initiating the bankruptcy proceedings. He also should have ensured that [the client] had a reasonable opportunity to seek independent advice of counsel by advising him

to pursue such and should have obtained written consent prior to proceeding. *Id.* at 384.

The McDonalds claim that *Snyder* required Mr. Barber to disclose his conflicting interest in a contemporaneous writing and to obtain the McDonalds' written consent prior to proceeding with the negotiations to buy McRentals. The McDonalds misconstrue the nature of the requirement of Rule 4–1.8(a)(3) that the client must consent in writing when they argue that Mr. Barber failed to get the McDonalds' written consent prior to proceeding with his negotiations to buy McRentals. Contrary to their interpretation, the Supreme Court in *Snyder*, in applying the requirements of Rule 4–1.8(a)(3) to the facts of that case, found that one of the clients "consented to the *transaction* in writing." 35 S.W.3d at 383 (emphasis added). Relying upon the Supreme Court's interpretation of Rule 4–1.8(a)(3) in *Snyder*, Mr. Barber's burden was to prove that the McDonalds consented to the transaction in writing. Clearly, there was evidence that Mr. Barber obtained the McDonalds' written consent to the transaction when they executed the agreement.

In addition, contrary to the McDonalds' assertion, Mr. Barber did fully disclose, in a written waiver that was executed contemporaneously with the 1994 employment and stock option agreement, that a conflict of interest arose by his becoming an employee and stockholder of McRentals, and the McDonalds consented and signed the waiver. Moreover, at earlier stages of the negotiations, Clinton McDonald was given oral notice that that Mr. Barber was not representing the McDonalds in this transaction.

The McDonalds next claim that Mr. Barber had an undue advantage in the transaction because he failed to encourage them to seek independent coun-

sel. They quote the Supreme Court's statement in *Snyder*, when it considered whether the clients were given a reasonable opportunity to seek the advice of independent counsel in the transactions, that the attorney "should have ensured that [the client] had a reasonable opportunity to seek independent advice of counsel by advising him to pursue such. . . ." *Id.* at 384. Here, Mr. Barber admitted that he did not expressly encourage the McDonalds to seek outside counsel. He merely told them that he would not be offended if they did. The better course of action would have been for Mr. Barber to encourage the McDonalds to seek the advice of independent counsel. His failure does not aid the McDonalds, however, because their conduct demonstrates that they knew they had the opportunity to seek the advice of independent counsel and they took advantage of that opportunity. The fact that the McDonalds sought outside counsel with Mr. Fischer during the negotiations with Mr. Barber is sufficient evidence to support the trial court's finding that the McDonalds were fully aware of their rights and had the opportunity to consult outside counsel.

The McDonalds contend, however, that their limited consultation with an attorney during one stage of the negotiations demonstrates the undue advantage Mr. Barber exercised in the transaction. We disagree. That the McDonalds sought and obtained independent legal advice during the course of the negotiations with Mr. Barber is evidence that they knew Mr. Barber's interests were adverse to their own and that they had the ability to obtain independent advice at all stages of the negotiations. This evidence demonstrates that the McDonalds and Mr. Barber operated on a

level playing field. The McDonalds knew that Mr. Barber was not acting as their attorney in the negotiation process because they consulted an attorney about one of the agreements negotiated with Mr. Barber—albeit a different agreement than the one executed by the parties.[7]

■ As we stated previously, the law required Mr. Barber to establish that the "contract was negotiated in an atmosphere of full disclosure and free of any influence of trust and confidence inherent in the attorney client relationship." *Gardner*, 611 S.W.2d at 321. To do this, Mr. Barber needed to establish that the McDonalds " 'had the benefit of impartial advice *or* w[ere] fully informed of the nature and effect of [their] act[s] so that [they were] in the same position as if [they] had dealt [with] a stranger.' " *Flanagan*, 533 S.W.2d at 595 (quoting 7 C.J.S. Attorney and Client § 128 (1937)) (emphasis added). Indeed, even Rule 4–1.8(a) requires only that the client be "given a reasonable opportunity to seek the advice of independent counsel in the transaction." The evidence establishes that the McDonalds had a reasonable opportunity to seek the advice of independent counsel and that they knew that they had the right to seek independent counsel as evidenced by their consulting an attorney during the negotiation process. The McDonalds were fully informed of the nature the transaction with Mr. Barber.

■ The McDonalds argue, however, that Mr. Barber did not fully disclose to them all of the information necessary to make the negotiations fair. In particular they assert that Mr. Barber did not fully inform them of the "downside risks" of the

---

**7.** This is further evidenced by Clinton McDonald's attempt during discovery and trial to conceal the fact he consulted with an attorney during their negotiations. Only after being presented with a copy of the attorney's bill did Clinton McDonald admit that he had consulted with an attorney during his negotiations with Mr. Barber.

agreement. The McDonalds reference the downside risks about which Mr. Barber failed to advise them as "giving up on Steinheider, losing Reda's expertise, hiring a president with no experience at a very expensive price, all of the problems identified by [the McDonalds' expert]." The McDonalds rely on cases from other jurisdictions to support their argument that "full disclosure" includes an explanation of the downside risks of the transaction. One of the cases upon which the McDonalds rely is *In the Matter of Neville,* 147 Ariz. 106, 708 P.2d 1297, 1304 (1985), in which the Arizona Supreme Court held that "[t]he lawyer must give the client that information which he would have been obliged to give if he had been counsel rather than interested party, and the transaction must be as beneficial to the client as it would have been had the client been dealing with a stranger rather than with his lawyer." The Court further found that " 'full disclosure' requires not only a full explanation of the divergence in interest between the lawyer and the client, and an explanation about the need to seek independent legal advice, but also 'a detailed explanation of the risks and disadvantages which flow from the agreement.' " *Id. See also Abstract & Title Corp. of Fla. v. Cochran,* 414 So.2d 284, 285 (Fla.Dist.Ct.App.1982) (lawyer must give client all the information and advice which it would have been duty to give if transaction made with stranger). While this requirement has found favor in other jurisdictions, there are no Missouri cases that have imposed this burden on the attorney. While in *Flanagan,* 533 S.W.2d at 595, the Missouri Supreme Court quotes from 7 C.J.S. Attorney and Client § 128 (1937), the general rule that the client must have " 'the benefit of impartial advice

or [be] fully informed of the nature and *effect* of his act so that he was in the same position as it he had dealt with a stranger,' " this court interprets that requirement to be that the client must be informed and understand what the client is agreeing to, not whether it is advantageous for the client to enter into the transaction. (Emphasis added). That concept seems to be addressed in Missouri law, but the requirement is that the transaction must, in fact, be fair and reasonable.

The evidence, here, established that Clinton McDonald approached Mr. Barber about purchasing McRentals after he decided against the Steinheider deal and that Clinton McDonald made the decision not to consult with Mr. Reda with respect to the deal with Mr. Barber.[8] The evidence also established that Clinton McDonald knew that Mr. Barber was an attorney and that Mr. Barber had not operated any rent-to-own stores, but that Clinton McDonald wanted to hire Mr. Barber as president of McRentals for $100,000 a year for 20 years and also give him bonuses and stock options.

Although the McDonalds contend otherwise, the evidence established that Mr. Barber made the necessary disclosures to the McDonalds to deal with them at arm's length. *Shaffer,* 648 S.W.2d at 607. Before the agreement was executed, Clinton McDonald and Mr. Barber met to review, negotiate and discuss the terms of the agreement, and numerous changes were made to the agreement at the request of Clinton McDonald. Mr. Barber also met with all the McDonalds on the day the agreement was to be signed and reviewed all the terms of the contract. At this meeting, the McDonalds read, discussed and again modified the agreement at the request of Clinton McDonald. Mr. Barber

8. Clinton McDonald did not terminate Mr. Reda; he just informed Mr. Reda that he would no longer be pursuing the deal with Mr. Steinheider.

also read aloud the handwritten conflict of interest waiver before the McDonalds signed it. The McDonalds understood that they would be hiring Mr. Barber to serve as president of McRentals for 20 years at a salary of $100,000 per year, plus bonuses, and that Mr. Barber would have the option to purchase stock in the company. Sufficient evidence existed to establish that the McDonalds were fully informed and "perfectly understood" Mr. Barber's adverse interest in the agreement. *Id.* at 608.

Finally, in regard to their first point, the McDonalds assert that the trial court applied incorrect legal standards to its analysis of undue advantage and that the trial court gave unnecessary weight to Clinton McDonald's sophistication as a businessman. We disagree.

■ First, the McDonalds contend that paragraph five of the trial court's "conclusions of law demonstrates the court's fundamental misapprehension of what was required to rebut the presumption of undue advantage." Paragraph five says, "The Court hereby finds and concludes that the actions, conduct and representation made by [Mr. Barber] did not destroy the free choice of [the McDonalds] in executing the Employment and Stock Option Agreement." The McDonalds argue that this finding demonstrates that the trial court improperly applied an "undue influence" standard incorporating the issue of whether the client's "free will" was destroyed to determine the issue of undue advantage. See M.A.I. 15.03. The McDonalds, however, fail to point out that the trial court also

held in paragraph 3 of its conclusions of law that "Mr. Barber did not take undue advantage of the [McDonalds] during the negotiation and execution of the Employment and Stock Option Agreement." Thus, this demonstrates that the trial court applied the correct legal standard.[9] At most, the trial court made an additional conclusion concerning "undue influence" to justify its decision that Mr. Barber did not breach any fiduciary duty to the McDonalds.

The McDonalds also assert that the trial court erroneously concluded that proximate cause is relevant to the issue of rescission. The trial court held that "any alleged impropriety of undue advantage taken by Mr. Barber (as alleged by Plaintiff) during the course of negotiations was not the proximate cause as to why Plaintiffs elected to execute the [agreement]." Although we agree with the McDonalds, that the case law does not list proximate cause as an element necessary to prove that an attorney-client transaction must be rescinded, this conclusion by the trial court was merely another additional conclusion made by the trial court. The trial court determined that Mr. Barber did not take undue advantage of the McDonalds during the negotiation and execution of the agreement. The trial court did not apply an incorrect legal standard.

The McDonalds also complain that the trial court wrongly focused on Clinton McDonald's sophistication and skill as a businessman in deciding that Mr. Barber did not take undue advantage of the Mc-

9. In response to the McDonalds' claim that the trial court improperly applied an "undue influence" standard, Mr. Barber argues that the Supreme Court in *Flanagan,* 533 S.W.2d at 595, utilized the "undue influence" standard. The Court did state, in *Flanagan,* that a "client's transfer of his property to his attorney is subject to being set aside as resulting from *undue influence* unless the attorney is able to meet the burden of proving the transaction was fair and equitable." *Id.* at 597. (emphasis added). Nevertheless, when applying that standard the Court applied the same criteria as the "undue advantage" standard, not the "undue influence" standard from will contest cases that Mr. Barber encourages.

Donalds. In making its decision, however, the trial court did not merely rely on Clinton McDonald's sophistication and skill as a businessman. The trial court based its conclusion upon the evidence, which established that the agreement between Mr. Barber and the McDonalds was the product of arm's length negotiations. The trial court in no way suggested that the fact that Clinton McDonald was a sophisticated businessman somehow lessened Mr. Barber's fiduciary obligations to the McDonalds. Mr. Barber bore the burden of establishing that he took no undue advantage of the McDonalds, and the evidence established that he did not.

### Agreement Fair and Reasonable

 In their second point on appeal, the McDonalds assert that the trial court erred in concluding that the terms of the agreement were fair and reasonable. Because of the attorney-client relationship, Mr. Barber bore the burden of establishing that the transaction and agreement were fair and reasonable. *Gardner*, 611 S.W.2d at 321. To satisfy this burden, Mr. Barber had to show that the agreement was entered "for an adequate consideration." *Flanagan*, 533 S.W.2d at 595. The McDonalds contend that Mr. Barber did not give the McDonalds adequate consideration for the benefits that he received under the agreement. In support of their contention, they rely on this court's statement in *Gardner* that the evidence must show "that the nature and extent of services performed and to be performed [by the attorney] were commensurate with the charges provided for under the terms of the contract." *Gardner*, 611 S.W.2d at 321.

Relying on *Gardner*, the McDonalds assert that to establish adequate consideration Mr. Barber had to show that the

services he rendered as president of McRentals were commensurate with the salary, bonuses, distributions and stock options he would receive under the agreement. In *Gardner*, the attorney was providing tax and investment advice to the client during an ongoing attorney-client relationship. The trial court found that the evidence was "sparse" as to the extent of the services performed by the attorney on behalf of the client under the tax and investment advisory contract and concluded that not a "scintilla of evidence" showed "that the nature and extent of services performed and to be performed [by the attorney] were commensurate with the charges provided for under the terms of the contract." *Id.* at 320–21.

In *Gardner*, the court was concerned with whether the attorney met his burden of proof in establishing that the tax and investment advisory contract did not result from undue advantage and that it was fair and reasonable. *Id.* at 321. The court found that the attorney did not meet his burden of proof. The court seemingly focused on the ongoing attorney-client relationship and whether the additional services provided for by the attorney were fair and reasonable. Indeed, the disciplinary rules in effect at the time *Gardner* was decided said that in determining the reasonableness of attorney's fees, we should look at the "time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly." Rule 4, DR–2–106 (B)(1) (1980).[10] Although we recognize that such rules do not create a private cause of action for a client, the courts can look to the rules for guidance. *See Greening*, 652 S.W.2d at 734. The *Gardner* court, therefore, properly looked for evidence of whether the services provided by

---

**10.** This rule is now codified at Rule 4– 1.5(a)(1).

the attorney under the tax and investment advisory contract were commensurate to the charges provided for under the contract. The agreement at issue in this case, however, was far different than the contract at issue in *Gardner*. Mr. Barber was not merely providing additional legal services to the McDonalds during an ongoing attorney-client relationship; instead, he was promising and agreeing to become president of McRentals for a term of 20 years.

Pursuant to the agreement, Mr. Barber agreed to devote "such time and attention necessary for the performance of his duties as the President of the Company." After signing the agreement, Mr. Barber resigned as shareholder of the Fairchild Stang law firm and went to work for McRentals. In return, Mr. Barber was guaranteed under the contract a $100,000 annual salary, with no increases through the 20–year contract term. Mr. Barber had the right to receive mandatory bonuses of 20 percent of the adjusted net income after $2 million was paid to the stockholders, 34 percent after $3 million was paid and 50 percent after $4 million was paid. He also received the option to purchase the stock of the corporation at any time during the 20–year term of the contract, and the McDonalds were restricted from transferring their stock.

Pursuant to the agreement, Mr. Barber could not freely resign as president of McRentals without penalty. The agreement provided that Mr. Barber could resign only if "(a) the sale of all of the stock in the Company or substantially all of the assets of the Company is arranged by Employee to the reasonable satisfaction of the Chairman of the Board or if (b) a replacement for Employee is arranged by Employee who is reasonably acceptable to the Chairman of the Board." If Mr. Barber resigned without fulfilling one of these conditions, he would forfeit all his existing stock and all future stock options and be subject to legal or equitable action brought by the McDonalds against him. In addition, if he were terminated for cause, he would also forfeit his existing stock and all future stock options.

A finding of consideration does not depend on "the existence of a consideration clause or a money payment." *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431, 434 (Mo.App.1996). Under Missouri law, a detriment to the promisee or benefit to the promisor can constitute consideration sufficient to support a contract. *Moore v. Seabaugh*, 684 S.W.2d 492, 496 (Mo.App.1984). As the *Seabaugh* court explained:

> Detriment to promisee may consist of doing anything legally he is not bound to do or refraining from doing anything he has a right to do. See *Heath v. Spitzmiller*, 663 S.W.2d 351, 356 (Mo.App. 1983). Valuable consideration may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, loss or responsibility, given, suffered or undertaken by the other. *Atherton v. Atherton*, 480 S.W.2d 513, 518[6] (Mo.App.1972).

As a result of the agreement, Mr. Barber essentially gave up his position as an attorney [11] to assume the responsibilities of president of McRentals to manage the day to day business and affairs of the rent-to-own stores. During his tenure as president of McRentals, Mr. Barber worked full time, working 50 to 60 hours per week.

---

**11.** The evidence did establish that Mr. Barber received some compensation for the performance of legal services after he became president of McRentals, but this compensation was primarily the result of the conclusion of legal work begun while he was a partner at the Fairchild Stang law firm.

He opened two new rental stores, bringing the total to 18 stores. He increased company sales, profits and inventory and maintained corporate growth at 11.12 percent per year. Mr. Barber also secured a $60,000 workers' compensation premium refund. Mr. Barber, along with Mr. Bizel, persuaded the IRS to conclude an audit and to concede that rent-to-own contracts were not installment sales contracts. The threat of unfavorable tax treatment of the rent-to-own contracts was a significant threat to the profitability of McRentals and the source of Mr. Steinheider's request for guarantees when he was negotiating with Mr. McDonald.

The agreement also benefited the McDonalds in that they were no longer responsible for the day-to-day affairs of the company, but yet they continued to be the beneficiaries of the substantial profits from McRentals. The agreement also provided multiple safeguards to protect the McDonalds' interest in the business. The agreement required Mr. Barber "to observe and comply with the directions and restrictions as the Chairman of the Board may establish from time to time with regard to management of the Company." It said that Clinton McDonald, as chairman of the board, had final authority over all management decisions, except the 12 "Major Decisions" items that could be undertaken only with the mutual consent of both Mr. Barber and the chairman of the board. The McDonalds also retained corporate control of McRentals until all of the stock had been purchased.

Moreover, in the event that Mr. Barber decided that he would like to purchase the stock in the company, he had to pay the McDonalds 2.45 times the adjusted book value of the stock. The only way Mr. Barber could receive the mandatory bonuses under the agreement was to grow the company, increase profitability and pay $2 million in distributions to the McDonalds so that he, too, could start sharing in the company profits. This incentive for Mr. Barber to increase the profitability of the business to obtain the bonuses would work to his detriment because he would be compelled to pay more for the stock in that the company's book value would increase. Whether or not Mr. Barber exercised the stock options, the McDonalds would continue to receive distributions as a result of the work provided by Mr. Barber to make McRentals a success.[12]

The McDonalds argue, however, that this court must compare what Mr. Barber gave up as a practicing attorney to what he received as president of McRentals. They contend that this establishes the inequity of the exchange of consideration. They claim that Mr. Barber gave something valued at $698,351 (representing the amount that Mr. Barber would have received if he practiced law during the same time period) and that he would have received something valued at $4,432,758 for the time remaining on his agreement with the McDonalds. We do not agree that Mr. Barber's salary as an attorney is the benchmark to determine whether what he gave when he assumed the position as president of McRentals was fair and reasonable. His resigning his position as a shareholder in a law firm is just one factor in the determination of whether the agreement was fair and reasonable. His ability to make contributions as president, as outlined above, must also be considered in our determination.

12. The McDonalds argue that they would have been entitled to receive those distributions with respect to their stock with or without the agreement with Mr. Barber. They fail to recognize, however, that their receipt of future distributions would in fact depend upon the management of the company—management that was provided by Mr. Barber.

Although we agree with the McDonalds that no one put a monetary amount on what the services provided by Mr. Barber were worth, we conclude that substantial evidence supported the trial court's conclusion that the agreement between Mr. Barber and the McDonalds was fair and reasonable. Given the sacrifice made by Mr. Barber, the work Mr. Barber put into McRentals, and the benefits received by the McDonalds, the evidence established that valuable consideration supported the agreement between Mr. Barber and McDonalds.

Moreover, we also note that the trial court found that the agreement between Mr. Barber and the McDonalds provided the McDonalds "with anticipated compensation far in excess of the Steinheider $2.4 million sales price." Clinton McDonald also testified that he believed that the purchase price offered by Mr. Steinheider was fair and reasonable. Additionally, in regard to the Steinheider deal, Clinton McDonald approved of the $150,000 annual salary to be paid to Mr. Steinheider and his business partner, which is additional evidence that the salary paid was reasonable. The agreement between the McDonalds and Mr. Barber gave the McDonalds the very real prospect of realizing monetary payments far in excess of the amount for which the McDonalds were willing initially to sell McRentals. If the contract had run its course, most likely the McDonalds would have received compensation many times their original sale price and possibly retained corporate ownership if Mr. Barber did not exercise the stock options. The McDonalds' return on their investment is a relevant factor the court could and did consider in determining the fairness of the agreement.

While there are provisions of the agreement that were unfavorable to the McDonald's, such as the bonuses of 50 per-

cent after the payment of $4 million and the restriction of their ability to transfer their stock for twenty years, the contract as a whole was fair and reasonable. The effect of the agreement was that they secured stable, capable, motivated management of their corporation for the long term and that they received a favorable return on their investment. While Mr. Barber received very favorable treatment under the agreement, so, also, did the McDonalds.

Mr. Barber did not take undue advantage of the McDonalds, and the agreement was fair and reasonable. Because we reach this conclusion, we need not address the McDonalds' remaining contention on appeal that the trial court erred when it concluded alternatively that the McDonalds' rescission claim was barred by laches and estoppel.

The judgment of the trial court is affirmed.

All concur.